Michael HOWARD, et al., Plaintiffs,

v.

John L. McLUCAS, et al., Defendants.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
et al., Plaintiffs,

v.

John C. STETSON, Secretary, U.S. Air
Force, Defendant.

Civ. A. Nos. 75–168–MAC, 79–66–MAC.

United States District Court,
M.D. Georgia,
Macon Division.

Nov. 20, 1984.

See also, D.C., 597 F.Supp. 1501.

Jack Greenberg, New York City, Bill Lann Lee, Los Angeles, Cal., Thomas M. Jackson, Charles A. Mathis, Jr., Macon, Ga., Austin E. Catts, Atlanta, Ga., for plaintiffs.

Anne L. Weismann, Dept. of Justice, Washington, D.C., John L. Lynch, Asst. U.S. Atty., Macon, Ga., for defendants.

OWENS, Chief Judge.

### Introduction

Counsel for all parties to these consolidated lawsuits have agreed to settle their differences without a trial. The terms of this settlement are set forth in a Consent Decree filed with this court on June 15, 1984. Public notice of this settlement was provided. All persons who believed they might be affected by the settlement were instructed as to how they could make their concerns known to this court. Comments and objections by both class members (black employees at Warner Robins AFB) and non-class members (white employees at Warner Robins AFB, organized as the "Warner Robins Constitutional Rights Fund") were heard by the court at a fairness hearing held on August 9, 1984. Counsel now requests this court to give final approval to the Consent Decree proposed in settlement of these cases.

### The Court's Role in Reviewing This Settlement

In every civil lawsuit the parties are permitted to discover the strengths and weaknesses of their opponent's case. With full knowledge of the merits of the case, the parties are encouraged to discuss the possibility of negotiating a mutually agreeable settlement. A settlement has many advantages. It avoids a lengthy trial which frequently causes hostility and ill will to develop between the parties. A trial drags personal affairs into public view; each side frequently accuses the other of lying. In the end, a stranger (the judge) steps in, adjudicates the parties' differences, and orders a result that is not palatable to one side of the case. A settlement, on the other hand, creates an atmosphere of conciliation; the parties agree among themselves—without outside interference—to a compromise in which each side receives a benefit. The plaintiffs usually receive relief which they agree is fair, but without the expense and delay of trial and appeals. The defendants usually agree to pay less than what a judge or jury might award, and receive the benefit of supervising their own conduct, as opposed to being forced to submit to the judgment of a court. This court can encourage but cannot compel parties to a lawsuit to settle their differences; both plaintiffs and defendants have an absolute right to insist upon a trial. However, while perhaps less obvious but equally as true, this court cannot prevent parties to a lawsuit from settling their differences without a trial if they so desire.

In a typical civil lawsuit this court is not called upon to approve a settlement

reached by the parties. Indeed, in most personal injury settlements the court is not even apprised of the amount of money the parties agree upon—the court is simply told that the parties have agreed to dismiss the case. This case, however, is different. Since the plaintiffs number in the thousands, this case has proceeded as a class action. Obviously, each and every one of the thousands of plaintiffs could not be consulted in the negotiations leading to a settlement. Because of a fear that the named plaintiffs or their attorneys might be too quick to settle a case to the detriment of the class members who could not participate in the negotiations, Congress enacted the following rule which governs the settlement of class action lawsuits:

(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Fed.R.Civ.P. 23(e). "Approval of the court" is to be granted if the settlement is basically fair to all concerned. This is why the court held a "fairness" hearing, and allowed both class members and non-class members to speak on the question of fairness. However, the court's responsibility to approve or disapprove does *not* give this court the power to force the parties to agree to terms they oppose. The court must either approve or disapprove of the settlement *as a whole*, and *as written* by the parties. In this case, it was the parties, including the United States Air Force, who agreed to the 240 promotions and the monetary award to which many object. This court did not suggest either the 240 promotions or the monetary award and cannot compel either party to change either without a trial on the merits. The court's only function is to assess the settlement's basic fairness in light of all objections, under the standards discussed below. If the settlement is found to be a fair one, this court must approve it. This court is not empowered to force parties who choose to settle to go to trial.

The factors which this court must consider in deciding whether the settlement is fair have been firmly established by a long line of decided cases. These standards were set forth by Judge James C. Hill in a 1977 decision of the United States Court of Appeals for the Fifth Circuit:

"In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable and is not the product of collusion between the parties. *Young v. Katz*, 447 F.2d 431 (5th Cir.1971).

"A threshold requirement is that the trial judge undertake an analysis of the facts and the law relevant to the proposed compromise. A 'mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law' will not suffice. *Protective Committee v. Anderson*, 390 U.S. 414, 434, 88 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968).

"In addition to undertaking such an analysis, it is essential that the trial judge support his conclusions by memorandum opinion or otherwise in the record. An appellate court, in the event of an appeal, must have a basis for judging the exercise of the trial judge's discretion. *Protective Committee v. Anderson, supra.*

"In determining the fairness, adequacy and reasonableness of the proposed compromise, the inquiry should focus upon the terms of the settlement. The settlement terms should be compared with the likely rewards the class would have received following a successful trial of the case. *Protective Committee v. Anderson, supra.* The relief sought in the complaint may be helpful to establish a benchmark by which to compare the settlement terms. *See Norman v. McKee*, 431 F.2d 769 (9th Cir.1970).

"In Title VII class actions, the District Court is particularly suited to perform this task since the trial judge is given broad discretion in the fashioning of the proper remedial relief to eliminate employment discrimination. *See Albemarle Paper Co.*

*v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

"Yet, in evaluating the terms of the compromise in relation to the likely benefits of a successful trial, the trial judge ought not try the case in the settlement hearings. *Young v. Katz, supra.*

" 'It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute. *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 456 (2d Cir. 1974), *Grunin v. International House of Pancakes,* 513 F.2d 114, 123 (8th Cir.1975).'

"Neither should it be forgotten that compromise is the essence of a settlement. The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.' *Milstein v. Werner,* 57 F.R.D. 515, 524–25 (S.D.N.Y. 1972).

"In performing this balancing task, the trial court is entitled to rely upon the judgment of experienced counsel for the parties. *Flinn v. FMC Corporation,* 528 F.2d 1169 (4th Cir.1975). Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel. *Id.* at 1173.

"In addition to examining the merits of a proposed settlement and ascertaining the views of counsel, the Court should consider other factors.

"Practical considerations may be taken into account. It is often said that litigants should be encouraged to determine their respective rights between themselves. *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir.1975) (and cases cited therein). Particularly in class action suits, there is an overriding public interest in favor of settlement. *Id.; Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir.1976). It is common knowledge that class action suits have a well deserved reputation as being most complex. The requirement that counsel for the class be experienced attests to the complexity of the class action. *Eisen v. Carlisle and Jacquelin,* 391 F.2d 555 (2d Cir. 1968).

"A review of the leading cases from this Circuit involving litigation of employment discrimination in class actions profitably shows the length of time and expense which must be incurred before the dust of combat has finally settled. *See, e.g., United States v. United States Steel Corporation,* 520 F.2d 1043 (5th Cir.1975); *Pettway v. American Cast Iron Pipe Company,* 494 F.2d 211 (5th Cir.1974). In these days of increasing congestion within the federal court system, settlements contribute greatly to the efficient utilization of our scarce judicial resources.

"In a Title VII case, as here, the policy favoring settlement is even stronger in view of the emphasis placed upon voluntary conciliation by the Act itself. *United States v. Allegheny-Ludlum Industries, Inc., supra; Patterson v. Newspaper & Mail Del. U. of N.Y. & Vic.,* 514 F.2d 767 (2d Cir.1975).

'While the public objectives embodied in Title VII warrant a careful review of the provisions of the settlement in light of these policies, ..., the clear policy in favor of encouraging settlements must also be taken into account, ... particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals.' *Patterson, supra* at 771 (citations omitted).

"When, during the course of the litigation, it becomes known to the Court that a portion of the class objects to the proposed settlement, the trial judge must assume additional responsibilities. The trial court must extend to the objectors leave to be heard. *See, Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832 (9th Cir. 1976). However, this is not to say that the

trial judge is required to open to question and debate every provision of the proposed compromise.

"The growing rule is that the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision. *See, Flinn v. FMC Corporation, supra; City of Detroit v. Grinnell Corporation, supra.*

"The Court should examine the settlement in light of the objections raised and set forth on the record a reasoned response to the objections including findings of fact and conclusions of law necessary to support the response. *Mandujano v. Basic Vegetable Products, Inc., supra.*

"In assessing the fairness of the proposed compromise, the number of objectors is a factor to be considered but is not controlling. *Bryan v. Pittsburg Plate Glass Co.,* 494 F.2d 799 (3d Cir.1974). A settlement can be fair notwithstanding a large number of class members who oppose it. *Id.*

"The trial judge must then make a determination as to whether or not to approve the settlement, or he may make suggestions to the parties for modifications of the proposal. Approval must then be given or withheld."

*Cotton v. Hinton,* 559 F.2d 1326, 1330–31 (5th Cir.1977) (footnotes omitted). With these standards in mind, the court now turns to the facts established to date and the terms of the proposed settlement.

### Findings of Fact [1]

1. Warner Robins is located at Robins Air Force Base, approximately 18 miles south of Macon, Georgia. Warner Robins is the largest single employer in the Macon area. It employs approximately 15,000 civilian employees, although the number of employees fluctuates.

Warner Robins is part of the Air Force Logistics Command and has the following four basic missions: (1) logistics management for assigned aircraft and commodities, (2) repair for aircraft and technologies (including the repair, modification and overhaul of aircraft and equipment), (3) receiving, storing, issuing and transporting spare parts and systems, and (4) awarding of contracts annually for Air Force-wide procurement responsibilities.

2. Warner Robins employs both blue collar and white collar employees. Blue collar employees are classified under the Wage Grade (WG) pay plan. WG employees in various occupations are divided into grade levels from 1 through 14. White collar employees are classified under the General Schedule (GS) pay plan. GS employees in various occupations are divided into grade levels from 1 through 16.

3. Warner Robins operates under an internal promotion policy in which employees in lower grades get the first opportunity to fill higher level positions. The initial "area of consideration" is base-wide for all jobs, except for higher level jobs at GS–14 and above, in which the area of consideration is Command-wide and those covered under Air Force and Department of Defense career programs. If it is determined that a position cannot be filled internally, external staffing or hiring procedures are commenced.

4. Supervisors are almost exclusively promoted from within Warner Robins.

5. Candidates for competitive promotions at Warner Robins are identified through the use of a skills locator system which, unlike the announcement method, does not require the individual employee to apply to fill an individual vacancy. In 1964, the AFLC Civilian Skills Locator System (E246) was adopted by Warner Robins and employed a computer to store and reproduce essential employee information from each employee's Official Personnel Folder. This system was in use until October, 1978, when the Air Force instituted a

---

1. This statement of facts is not intended to be exhaustive or exclusive. Rather than repeat the voluminous details established by nine years of discovery, the court simply adopts the factual *stipulations* set forth in the jointly submitted Consent Decree and proposed Order Granting Final Approval to the Consent Decree.

new skills locator system called the Air Force Promotion and Placement Referral System (PPRS), which is currently in effect.

6. Under the E246 system, promotion registers of all qualified candidates were generated in rank order based on qualification requirements or Promotion Evaluation Patterns (PEPs). Primary ranking factors were applied to determine the basic eligibility requirements and initial ranking, while secondary factors were applied to determine final ranking and to evaluate the top five candidates and those lower ranking candidates who, with additional points, could rank among the certified group. In the event of ties or if meaningful distinctions could not be made between the candidates, as many as ten candidates could be referred.

7. Primary ranking factors under the E246 system included experience, written examinations and supervisory appraisals. Each element received one-third weight in the evaluation, unless only two elements were used and then each was weighted at 50%. Overall rankings were determined by the total number of points given for a designated element. Secondary ranking factors included awards and self-development activities.

8. The PPRS system is a more sophisticated skills locator system. In its first phase, all employees are screened for potential eligibility on the basis of such factors as pay, type of appointment and basic skills from information that has been entered into the computer through a comprehensive series of skills codes. Eligibility qualifications in this initial stage conform to standards set forth by the Office of Personnel Management.

9. All employees who satisfy the test of basic eligibility are then subject to a progression level ranking whereby candidates are ranked in groups based on promotion evaluation patterns. Each group or progression level contains up to five factors identifying general and specific skills, knowledge, and characteristics. Advancement from one level to another is made only after satisfying all requirements of the previous progression level. Each candidate within a given progression level is, in effect, in a tie with all other candidates who have progressed to that progression level. The number of progression levels is determined by the type and grade of the position to be filled.

10. A series of tie breakers, or "sort factors," are used to establish relative standing within a progression level and include supervisory appraisals, awards, and seniority. A specific promotion register is then generated, ranking all qualified candidates in descending order. Promotion candidates are certified to the selecting supervisor in ranked order. The average life of a promotion register is ninety days, except that career-board registers normally have a life of six to twelve months.

11. Under both the E246 and PPRS systems, every employee at Warner Robins is automatically considered for every vacancy. Consonant with the operation of a "skills locator system," employees are not notified that they have been considered for job vacancies unless they are at the top of a register and within reach for referral to a selecting official.

12. Under both the E246 and PPRA systems, no records exist for all employees who were considered for a specific job promotion. The skills locator systems only generate records of candidates who are found to be qualified.

*Statistical Evidence*

13. In 1973, blacks comprised 14% of the workforce at Warner Robins; in 1976 blacks comprised 15.3% of the workforce; and in 1978 blacks comprised 16.6% of the workforce.

14. In 1973, 65.2% of black GS employees were in GS 1–4 positions and 76.3% of black WG employees were in WG 1–8 positions. For that same year, 18.6% of white GS employees were in GS 1–4 positions and 31.2% of white WG employees were in WG 1–8 positions. In 1973, 85.7% of black employees held jobs in WL 2–8 and 85.8% of blacks held supervisory jobs in WS 1–8. In

that same year 2.5% of white employees held jobs in WL 2–8 and 25.9% of whites held supervisory jobs in WL 18.

15. The average grades of all employees in 1973 and 1975, respectively, were as follows:

Average Grades of White and Black Employees, 1973

| Pay Plan | All Employees | White Employees | Black Employees |
|---|---|---|---|
| GS | 7.8 | 8.0 | 4.5 |
| WG | 8.7 | 9.2 | 6.7 |
| WS | 9.7 | 10.0 | 6.6 |

Average Grades of White and Black Employees, 1975

| Pay Plan | All Employees | White Employees | Black Employees |
|---|---|---|---|
| GS | 7.8 | 8.0 | 4.6 |
| WG | 8.6 | 9.3 | 6.8 |
| WL | 9.6 | 9.9 | 5.0 |
| WS | 9.9 | 10.1 | 6.9 |

16. The number of supervisors by race in the workforce from 1968 through 1974 was as follows:

| Year | Total Supervisors | White Supervisors | Minority Supervisors |
|---|---|---|---|
| 1968 | 1,605 | 1,605 | 45 |
| 1969 | 1,937 | 1,890 | 47 |
| 1970 | 1,927 | 1,927 | 45 |
| 1972 | 1,614 | 1,560 | 54 |
| 1973 | 1,327 | 1,327 | 45 |
| 1974 | 1,338 | 1,289 | 49 |

17. Plaintiffs' statistics demonstrated that black employees were promoted to upper level jobs in proportions less than their representation in the workforce or in lower grades.

18. Plaintiffs' statistical analysis of the computer files for the period 1971 through 1978 showed statistical disparities in promotion rates out of grade in WG grade groupings 1–4, 5–8, and 9–12, and GS grade groupings 1–4, that plaintiffs' expert found to be statistically significant. From these statistics plaintiffs concluded that a total of 553 jobs had been lost to blacks.

| Grade Group | No. of Standard Deviations | Expected Promotions Lost to Blacks |
|---|---|---|
| WG 1–4 | 6.01 | 67.98 |
| WG 5–8 | 16.03 | 362.00 |
| WG 9–12 | 4.80 | 50.06 |
| GS 1–4 | 3.56 | 72.67 |

*Id.* (Fluctuations of more than 2 or 3 standard deviations undercut the hypothesis

that selections for promotions were being made randomly with respect to race. *See Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977).

19. Plaintiffs' more conservative analysis, controlling for occupational series, showed statistical disparities in the same WG grade groupings that plaintiffs found to be statistically significant, but no statistically significant disparities in any GS grade grouping. From this analysis, plaintiffs concluded that a total of 234 jobs had been lost to blacks.

| Grade Group | No. of Standard Deviations | Expected Promotions Lost to Blacks |
|---|---|---|
| WG 1–4 | 3.53 | 36.68 |
| WG 5–8 | 8.19 | 162.84 |
| WG 9–12 | 3.75 | 34.74 |

*History of this Lawsuit*

20. Six black employees—Michael Howard, Henry Taylor, Oliver Gilbert, Clifford Scott, Lewis Jones and Thomas Miller—filed this class action complaint on October 31, 1975, against the Secretary of the Air Force, the then Civil Service Commission and various individually named defendants. Irish Smith, a black employee, and the American Federation of Government Employees ("AFGE"), the union representing all non-management employees at Warner Robins, filed a class action complaint on January 4, 1979, against the Secretary of the Air Force.

21. Defendants filed answers which contested each and every allegation of employment discrimination in the complaints and denied liability in all respects.

22. On October 27, 1976, the court certified a class in the *Howard* case after full briefing and hearing. The certified class consisted of: "All past, present and future black employees of the Warner Robins Air Logistics Center." No class has been certified in *AFGE and Smith*. By order dated June 22, 1983, this Court ordered that the subject cases be consolidated for the purposes of trial.

23. The parties have engaged in extensive discovery on a formal and informal basis over the course of nine years. Numerous depositions were taken, great numbers of interrogatories were answered, numerous facts were admitted or stipulated, and voluminous documents were produced. Both parties engaged experts who prepared extensive statistical analyses based on Warner Robins' computer files. All discovery, including depositions of trial witnesses, was completed by January, 1984.

24. At the direction of the court, the parties submitted a final pretrial order in October, 1982. The pretrial order listed over 250 witnesses to be called at trial. Plaintiffs filed their pretrial proposed findings of fact and conclusions of law on January 10, 1983, and defendants filed their pretrial proposed findings of fact and conclusions of law on February 25, 1983. The parties have been ready for trial since then.

25. The case, however, was not tried. Instead, the parties engaged in extended settlement negotiations over the course of many months. This court played no role in the negotiations, but encouraged the parties in periodic conferences to engage in serious discussion of their remaining differences in light of the full record and deferred trial pending settlement negotiations.

*Terms of the Settlement*

The Consent Decree provides promotional relief to black employees who meet basic eligibility standards for promotion to certain GS, WG, WL, and WS positions, such that Warner Robins will fill 240 specified permanent positions through internal merit promotion processes from among qualified class members. Promotions will be made to every other next available vacancy in the specified positions until the 240 specified positions have been filled.[2]

26. Nothing in the settlement requires Warner Robins to promote or otherwise place any person into a position for which

that person is not at least minimally qualified under appropriate Federal Civil Service rules, regulations, and qualifications standards. "Normal basic eligibility requirements" are as defined by the Office of Personnel Management in Handbook X–118 or X–118C.

Only class members hired before January 1, 1980, will be eligible for the above promotional relief.

27. Commencing 240 days after court approval of the Consent Decree, defendants will report to the court every six (6) months for a period of five years, with copies to plaintiffs' counsel, on the implementation of this Consent Decree.

28. A class compensation fund of $3,750,000.00 shall be established and distributed among class members based on length of employment since January 1, 1964, and whether any EEO administrative charge or complaint was filed, under procedures specified in the Consent Decree. A class member must submit a completed claim form, as further described below, in order to receive a share of the class compensation fund. More senior employees and employees who filed EEO charges or complaints will receive larger amounts. Individual awards, of course, will vary. No share of the class compensation fund may exceed $15,000.00. The total class compensation fund is Three Million Seven Hundred and Fifty Thousand Dollars ($3,750,000.00).

Only class members who have been employed at least one year prior to the date of this order shall be eligible to apply for a share of this fund.

29. In addition, defendants will pay the reasonable attorneys' fees and costs of plaintiffs' counsel, including costs incurred in the employment of experts.

30. Each of the named plaintiffs shall be accorded specified individual relief, including retroactive promotions and back pay, in addition to a share of the class compensation fund, as described in ¶ 22 of

---

**2.** A complete explanation of the statistical methodology used to identify the 240 wage grade positions lost by blacks can be found in the

Proposed Order Granting Final Approval to the Consent Decree, ¶¶ 36–41.

the Consent Decree. In addition, $37,-500.00 of the class compensation fund shall be distributed to named plaintiffs as specified in ¶ 22 and Exhibit "B" of the Consent Decree.

*Objections to the Settlement*

31. In response to public notice of the Consent Decree, 70 written objections were filed by class members. This represents approximately 2% of the class of approximately 3,200.

32. Additionally, at least 882 written objections were filed by non-class member, white employees of Warner Robins AFB. Under separate order of this court, these non-class member objectors, organized as the Warner Robins Constitutional Rights Fund, were denied leave to intervene in these actions. As non-parties, their consent to this settlement is not required. However, because their interests arguably are affected by the Consent Decree, they were allowed to be present and register their objections.

33. The thrust of the class members' objections was that the Consent Decree should have afforded them greater relief. The thrust of the non-class members' objections was that the settlement goes too far; they relied primarily upon the Supreme Court's recent decision in *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984).

### Conclusions of Law

1. While this court must undertake an analysis of the facts and law underlying the Consent Decree, it is not the court's task to decide the merits of the controversy. The very purpose of a settlement is to avoid the delay and expense of trial. *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983).

■ 2. Nor is the court entitled to substitute its "own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Armstrong v. Board of School Directors,* 616 F.2d 305, 315 (7th Cir.1980); *Officers for Justice v.*

*Civil Service Comm'n,* 688 F.2d at 630; *Cotton v. Hinton,* 559 F.2d at 1331–32.

3. The Court of Appeals for the Fifth Circuit has adopted a six-part analysis to determine whether a proposed settlement is fair, reasonable, and adequate.

(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed v. General Motors Corp.,* 703 F.2d at 172.

*The Absence of Fraud or Collusion Behind the Settlement*

4. There is a clear absence of fraud or collusion behind the settlement; in fact no one has contended otherwise. The settlement is the result of arm's length negotiations commenced after years of discovery and trial preparation.

*The Complexity, Expense and Likely Duration of the Litigation*

5. These lawsuits present complex issues of law and fact that would consume great portions of the time and resources of the parties and the judicial system if this case were to go to trial. The parties initially estimated that trial time would consume two weeks, which now appears to be an exceedingly conservative estimate. "A review of the leading cases from this circuit involving litigation of employment discrimination in class actions profitably shows the length of time and expense which must be incurred before the dust of combat has finally settled." *Cotton v. Hinton,* 559 F.2d at 1331. By settling this action, the parties avoided substantial time and expense as well as the risk of an uncertain outcome.

*The State of the Proceedings and the Amount of Discovery Completed*

6. This case comes before the court after the parties have completed full dis-

covery and trial preparation. As a result, there was an adequate basis for the parties to act intelligently and in an informed manner in framing a detailed settlement.

*The Probability of Plaintiffs' Success on the Merits*

7. Both parties have developed factual support for their positions. The Supreme Court has held that statistics can provide evidence of deliberate and purposeful discrimination. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339–340, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). Plaintiffs' statistical analyses are a sufficient basis from which the court could infer that plaintiffs had made out a *prima facie* case of discrimination. Plaintiffs' unrebutted statistics, which show disparities especially in WG grade groupings 1–4, 5–8, and 9–12, are a sufficient basis from which to infer that blacks were concentrated in low level jobs and certain occupations. Plaintiffs' unrebutted analysis of defendants' promotion patterns is sufficient from which to infer that there was a disparity in promotions between blacks and whites at Warner Robins.

8. The court finds that plaintiffs' statistical evidence to which defendants, for purposes of this Consent Decree, have offered no evidence in rebuttal, establishes that plaintiffs have a sufficient probability of success on the merits to warrant entry of this Decree. It was reasonable for the parties to settle the litigation by providing plaintiffs classwide promotional relief and compensation for lost promotions.

9. In this case, plaintiffs' recovery approximates the range of possible recovery. Both the monetary relief and the 240 promotions to class members provided for in the Consent Decree were calculated from statistical evidence.

Plaintiffs' computer-based promotional analysis for occupational series was actual evidence that approximately 240 promotions were lost to black WG employees, *i.e.*, statistical disparities in promotion rates were attributable to at least 234 promotions that went to whites instead of blacks.

Dr. Drogin's work appears to be a conservative statistical analysis; the court has no reason to doubt its accuracy.

10. With respect to the 3.75 million dollar class compensation fund, each increase in grade was found by plaintiffs to be worth roughly $1,000.00. Assuming an average of 1.5 grade level increase per promotion, the 240 promotions lost to blacks resulted in economic loss of $360,000.00 per year. Assuming for purposes of a rough estimate that all the 240 promotions lost to blacks were evenly distributed over the period in question, the total economic loss resulting from the 240 positions was between 3.24 and 3.6 million dollars. The actual 3.75 million dollar class compensation fund, therefore, approximates the range of possible recovery if these cases were tried on their merits.

*Opinions of the Class Counsel, Class Representatives and Absent Class Members*

11. The court is entitled to rely on the opinion of experienced class counsel familiar with the litigation. *Cotton v. Hinton*, 559 F.2d at 1330. Such reliance is particularly appropriate in this case because plaintiffs' lead counsel, Mr. Lee, and the NAACP Legal Defense Fund have been involved in all aspects of the litigation from its inception and can be presumed to be fully informed as to the strengths and weaknesses of the parties' positions. This court, both in certifying the class in its October 27, 1976, order and in selecting them as plaintiffs' lead counsel in its September 2, 1980, order, has determined that plaintiffs' lead counsel and the NAACP Legal Defense Fund counsel are adequate class counsel. (The September 2, 1980, order disposed of a motion filed by one of the original counsel to withdraw the names of NAACP Legal Defense Fund attorneys as counsel in the case. The court concluded that the LDF "will best represent the class" because of its resources, its role in carrying the primary burden of the litigation and its ability to represent the interests of the absent class members.) Among the Legal Defense Fund counsel are Ronald L. Ellis, Esq., and O. Peter Sherwood,

Esq., experienced Title VII lawyers familiar with the case.

*Class Members' Objections to the Consent Decree*

12. The court cannot find fault with the Decree on the basis of unsupported conjecture. It is inevitable that some class members believe that the relief obtained by their counsel through negotiation is inadequate. However, all should keep in mind that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice v. Civil Service Comm'n,* 688 F.2d at 624, *quoting Cotton v. Hinton,* 599 F.2d at 1330. The court views as significant the fact that only 2% of all class members have objected to the settlement.

13. Several class members objected to the number of promotions provided in the Decree and stated that the promotional relief should include more supervisory and GS positions, but produced no facts in support of their opinions. Contrary to these unsupported opinions, the evidence submitted by the parties establishes that the 240 promotions to designated positions have factual support in the record and are fair, adequate, and reasonable relief. Moreover, class members will be eligible for promotions through regular promotion procedures over and above the 240 promotions; and the Consent Decree's procedural safeguards for class members denied promotions can be expected to increase the likelihood for nondiscriminatory promotions to all positions.

The court is unwilling to speculate on the merits of particular individual claims. Compromise is an integral part of any settlement. Nor will the court take issue with the judgment of class counsel that a settlement for classwide promotional and monetary relief was preferable to the risks of trial. The Decree's formulas for distribution of promotional and monetary relief by factoring in greater job tenure and whether administrative charges of discrimination were ever filed, appear calculated to accord relief to those with the greatest likelihood of success on the merits. The judgment of the parties that class members with greater job tenure and those who filed charges were more likely to prove discrimination is a fair and reasonable judgment.

*Objections by Non-Class Members*

14. As noted above, the proposed Consent Decree has naturally provoked considerable objection from white employees of Warner Robins AFB. Since these employees have not been allowed to intervene, they are not parties to these lawsuits and thus do not have to agree to the settlement. Nevertheless, the court is required to consider whether the effect on these employees is either unreasonable or proscribed. *Williams v. City of New Orleans,* 729 F.2d 1554, 1560 (5th Cir.1984), *quoting United States v. City of Miami,* 664 F.2d 435, 441 (5th Cir.1981).

15. First, the consent decree is not "proscribed" by law. Contrary to would-be intervenors' claims, the promotional relief of the Consent Decree is as "victim specific" as factually possible under the circumstances. The parties have fairly demonstrated that the relief is targeted to those positions actually lost by blacks. The actual victims cannot be identified due to the very nature of the Warner Robins promotion scheme, *i.e.,* there are no applicants for promotions.

16. Second, the promotional relief does not unreasonably trammel the interests of white employees. As the statistics demonstrate, the positions to be filled by blacks should have been filled by blacks years ago. The promotions set aside for blacks will be filled within approximately two years. More importantly, the 240 promotions set aside for blacks represent only a fraction of the total number of promotions anticipated during this two-year period— 3,600 promotions will most likely take place; only 240, or 6.5%, of those are set aside for class members. The interests of white objectors are not unreasonably affected.

*Conclusion*

The court has carefully considered the amended Consent Decree, and is confi-

dent that the Decree is fair, adequate, and reasonable to the parties. The settlement is most definitely in the public interest.

The Consent Decree, as amended, provides a fair, adequate, and reasonable resolution of this class action controversy. FINAL APPROVAL should be and is hereby GRANTED. Fed.R.Civ.P. 23(e).