**Michael HOWARD, et al., Plaintiffs,**

v.

**John L. McLUCAS, et al., Defendants.**

**Civ. A. No. 75–168–MAC (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Sept. 30, 1987.

As Corrected Oct. 5, 1987.

---

Jack Greenberg, Ronald L. Ellis, New York City, Bill Lann Lee, Los Angeles, Cal., Thomas M. Jackson, Macon, Ga., Charles A. Mathis, Jr., Mathis & Coates, Macon, Ga., Milledgeville, Ga., for plaintiffs.

John L. Lynch, Asst. U.S. Atty., Macon, Ga., Anne L. Weismann and Raphael Gomez, Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

Hunter R. Hughes, Rogers & Hardin, Robin Loeb Kurtzman, Edward T.M. Garland, The Garland Firm, P.C., and Charles A. Shanor, Atlanta, Ga., for plaintiff-intervenor.

Henry Taylor, Ga., pro se plaintiff for Notice of Appeal.

Joseph F. Henderson, Staff Counsel, American Federation of Government Employees, AFL–CIO, Washington, D.C., for AFGE.

OWENS, Chief Judge:

The court's duty at this moment is clear. It must once and for all put to rest the question of whether the proposed consent decree submitted in this case by the plaintiffs and defendants is a fair, adequate, reasonable, and lawful resolution of this class action controversy. This court's pre-

vious determination that the consent decree was, in fact, a fair, adequate, reasonable, and lawful resolution of this case has been set aside in part by the decision of the Eleventh Circuit Court of Appeals in *Howard v. McLucas*, 782 F.2d 956 (11th Cir. 1986). That decision, however, was not a finding by the Circuit Court that the decree in question was unreasonable or unlawful. The Circuit Court merely required that before this court could grant final approval to the consent decree, Intervenors, white and non-black minority employees at Warner Robins Air Logistics Center ("Warner Robins"), must be allowed to intervene so that they may have an opportunity to challenge the relief provided by the consent decree. In allowing the intervention, however, the Circuit Court limited Intervenors' challenge of the proposed consent decree solely to that portion of the decree that reserves 240 target position promotional opportunities to class members. *Id.* at 960. Intervenors have no standing to contest the backpay award or other remedial measures provided for in the consent decree. *Id.* at 960–61. Because of this limitation, the court's previous determinations with regard to the appropriateness of the non-promotional relief provided for in the consent decree are hereby readopted and made a part of this order for the reasons stated in the court's order dated November 20, 1984. The court next turns the issue of the adequacy and legality of the promotional relief.

### Appropriateness of the Promotional Relief

Before discussing the legal issues raised by the granting of promotional relief, it is important to point out the additional limitations imposed on Intervenors by the Eleventh Circuit that they must face in disputing the appropriateness of the promotional relief. First, the Eleventh Circuit's decision makes clear that Intervenors may not contest "the existence of past discrimination or any other issue concerning the merits of the dispute" between plaintiffs and defendants. *Id.* at 961. The second, and perhaps most important limitation, is the fact that the Eleventh Circuit refused to stay the implementation of the consent de-

cree. By the time the Circuit Court issued its decision, 169 target positions had been filled by members of the plaintiff class. To the extent that the targeted promotional positions have been filled, the issue of whether the promotional relief is appropriate has been mooted. *Id.* at 961 n. 4. With these limitations thus stated, the court must now proceed to the merits of Intervenors challenge.

The court begins its analysis by recognizing that voluntary settlement of Title VII employment discrimination suits is preferred by both Congress and the judiciary. *See Dent v. St. Louis San Francisco Railway Co.*, 406 F.2d 399, 402 (5th Cir.1969), *cert. denied*, 403 U.S. 912, 91 S.Ct. 2219, 29 L.Ed.2d 689 (1971). In fact, voluntary compromises of Title VII actions enjoy a presumption of validity, and should be approved "unless ... [they] contain[ ] provisions that are unreasonable, unlawful or against public policy." *See Kirkland v. New York State Department of Correctional Services*, 711 F.2d 1117, 1128–29 (2d Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984); *United States v. City of Alexandria*, 614 F.2d 1358, 1359, 1362 (5th Cir.1980); *Vulcan Society of New York City Fire Department, Inc. v. City of New York*, 96 F.R.D. 626, 629 (S.D.N.Y.1983); *Berkman v. City of New York*, 705 F.2d 584, 597 (2d Cir. 1983); and *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir.1981) (*en banc*). Where a consent decree is to be utilized, however, the district court has a duty to become more involved in the actual settlement process than it would in the ordinary case. In the case at bar, the court has striven to fulfill that duty. The evidence on this point is that the court has been completely involved in the pretrial proceedings. There have also been numerous pretrial conferences. Further, the court held an evidentiary fairness hearing on August 9, 1984, at which comments and objections by both class members (black employees at Warner Robins) and non-class members (white employees at Warner Robins, organized as the "Warner Robins Constitutional Rights Fund") were voiced. The court also

heard at that hearing plaintiffs' contentions with regard to the evidence in the case, plaintiffs' reasons why the relief sought was necessary, and plaintiffs justification of the methodology used to develop the plan for relief. This court is, therefore, fully cognizant of the facts and circumstances surrounding the case, and is now in a position to pass judgment on the proposed consent decree.

Because the decree will reach into the future and will have a continuing effect, the court must not only determine whether the settlement is fair, adequate, and reasonable, *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977), it must further examine the decree carefully to ascertain whether

> it does not put the court's sanction on and power behind a decree that violates Constitution, statute or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of the record, whether established by evidence, affidavit, or stipulation.

*See City of Miami,* 664 F.2d at 441. Where, as in this case, it is alleged that the rights of third parties, such as Intervenors, will be affected by the implementation of the decree, the court must carefully scrutinize the consent decree with respect to these alleged rights. If the court should conclude that the effect on the third parties is "neither unreasonable nor proscribed," it should be approved. *Id.* Furthermore, in determining whether a Title VII class action settlement agreement should be approved, courts should consider the probability of plaintiffs' success on the merits and the range of possible relief available given that success. *See Kirkland,* 711 F.2d at 1129; *Reed v. General Motors Corporation,* 703 F.2d 170, 172 (5th Cir.1983); *Plummer v. Chemical Bank,* 668 F.2d 654, 660 (2d Cir.1982); *see also Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981); *City of Detroit v. Grinnell Corporation,* 495 F.2d 448, 455 (2d Cir.1974). *See generally* 7B C. Wright & A. Miller, *Federal Practice and Procedure* § 1797.1, at 378–416 (1986). A review of these deci-

sions leads the court to believe that approval of the consent decree rests upon the resolution of two central inquiries: (1) whether there exists a condition that can serve as a basis for the creation of the promotional relief; and (2) whether the specific remedies of the compromise agreement are neither unreasonable nor unlawful. Intervenors' objections fall within the parameter of these inquiries, and can be summarized as follows: (1) that there is no basis for the creation of promotional relief because plaintiffs have not demonstrated any discrimination on the part of defendant, nor has any discrimination been admitted by defendant, and (2) even assuming that discrimination has been shown, the terms of the promotional relief are unreasonable and unlawful.

### A.   The Basis for the Promotional Relief

Despite the Eleventh Circuit's clear mandate that Intervenors would not be allowed to contest the findings of discrimination in this case, they continually argue in their briefs before the court that plaintiffs have made no showing of discrimination that might justify the relief provided for in the consent decree. While not required to address this finding, the court recognizes that the question of whether discrimination has been shown is critical to the issue of whether the promotional relief in this case is warranted. So in order to clarify this point, the court will elaborate on why a finding of discrimination is warranted in this case.

■ Before relief can be provided victims of discrimination, there obviously must be a finding of actual discrimination. The question is, however, whether that finding must be based on a formal finding by the trier of fact following a full trial, or whether something less is required. The case law on this subject clearly supports the latter approach. In fact, neither Title VII nor the Constitution prohibits compromise agreements implementing race-conscious remedies which are agreed to prior to a judicial determination on the merits. *See United Steelworkers of America v.*

*Weber*, 443 U.S. 193, 207–08, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979); and *Regents of University of California v. Bakke*, 438 U.S. 265, 301–03 n. 41, 98 S.Ct. 2733, 2754 n. 41, 57 L.Ed.2d 75. The parties must merely show that the relief provided is based upon some well substantiated claim of racial discrimination against the plaintiff class. *See Setser v. Novack Investment Co.*, 657 F.2d 962, 968 (8th Cir.1981); and *Valentine v. Smith*, 654 F.2d 503, 508 (8th Cir.), *cert. denied*, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). Plaintiff's have made such a showing.

■ This court has previously found that plaintiffs have made out a *prima facie* case of employment discrimination through the use of statistical evidence of disproportionate racial impact. In its previous order, the court made the following findings of fact:

**Statistical evidence**

13. In 1973, blacks comprised 14% of the workforce at Warner Robins; in 1976 blacks comprised 15.3% of the workforce; and in 1978 blacks comprised 16.6% of the workforce.

14. In 1973, 65.2% of black GS employees were in GS 1–4 positions and 76.3% of black WG employees were in WG 1–8 positions. For that same year, 18.6% of white GS employees were in GS 1–4 positions and 31.2% of white WG employees were in WG 1–8 positions. In 1973, 85.7% of black employees held jobs in WL 2–8 and 85.8% of blacks held supervisory jobs in WS 1–8. In that same year 2.5% of white employees held jobs in WL 2–8 and 25.9% of whites held supervisory jobs in WL 1–8.

15. The average grades of all employees in 1973 and 1975, respectively, were as follows:

Average Grades of White and Black Employees, 1973

| Pay Plan | All Employees | White Employees | Black Employees |
|---|---|---|---|
| GS | 7.8 | 8.0 | 4.5 |
| WG | 8.7 | 9.2 | 6.7 |
| WS | 9.7 | 10.0 | 6.6 |

Average Grades of White and Black Employees, 1975

| Pay Plan | All Employees | White Employees | Black Employees |
|---|---|---|---|
| GS | 7.8 | 8.0 | 4.6 |
| WG | 8.6 | 9.3 | 6.8 |
| WL | 9.6 | 9.9 | 5.0 |
| WS | 9.9 | 10.1 | 6.9 |

16. The number of supervisors by race in the workforce from 1968 through 1974 was as follows:

| Year | Total Supervisors | White Supervisors | Minority Supervisors |
|---|---|---|---|
| 1968 | 1,605 | 1,605 | 45 |
| 1969 | 1,937 | 1,890 | 47 |
| 1970 | 1,927 | 1,927 | 45 |
| 1972 | 1,614 | 1,560 | 54 |
| 1973 | 1,327 | 1,327 | 45 |
| 1974 | 1,338 | 1,289 | 49 |

17. Plaintiffs' statistics demonstrated that black employees were promoted to upper level jobs in proportions less than their representation in the workforce or in lower grades.

18. Plaintiffs' statistical analysis of the computer files for the period 1971 through 1978 showed statistical disparities in promotion rates out of grade in WG grade groupings 1–4, 5–8, and 9–12, and GS grade grouping 1–4, that plaintiffs' expert found to be statistically significant. From these statistics plaintiffs concluded that a total of 553 jobs had been lost to blacks.

| Grade Group | No. of Standard Deviations | Expected Promotions Lost to Blacks |
|---|---|---|
| WG 1–4 | 6.01 | 67.98 |
| WG 5–8 | 16.03 | 362.00 |
| WG 9–12 | 4.80 | 50.06 |
| GS 1–4 | 3.56 | 72.67 |

*Id.* (Fluctuations of more than 2 or 3 standard deviations undercut the hypothesis that selections for promotions were being made randomly with respect to race.) *See Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Hazelwood School District v. United States*, 433 U.S. 299, 311, 97 S.Ct. 2736, 2743, 53 L.Ed.2d 768 (1977).

19. Plaintiffs' more conservative analysis, controlling for occupational series, showed statistical disparities in the same WG grade groupings that plaintiffs found to be statistically significant, but

no statistically significant disparities in any GS grade grouping. From this analysis, plaintiffs concluded that a total of 234 jobs had been lost to blacks.

| Grade Group | No. of Standard Deviations | Expected Promotions Lost to Blacks |
|---|---|---|
| WG 1–4 | 3.53 | 36.68 |
| WG 5–8 | 8.19 | 162.84 |
| WG 9–12 | 3.75 | 34.74 |

*See Howard v. McLucas,* 597 F.Supp. 1501 at 1509–10 (M.D.Ga.1984). These findings are not subject to attack by Intervenors since the Eleventh Circuit has affirmatively held that they do not have standing to contest findings relating to "past discrimination or any other issue concerning the merits of the dispute" between plaintiffs and defendants. *Howard v. McLucas,* 782 F.2d at 960–61. The accuracy of these statistics not being subject to attack, Intervenors are left only with the argument that these unchallenged statistical studies are insufficient as a matter of law to make out a *prima facie* case of discrimination. The Second Circuit in *Kirkland* addressed this argument and found that, contrary to Intervenors' assertion, where a defendant enters into a compromise without rebutting an established *prima facie* case, the fact that he enters into a compromise amounts to an admission of unlawful discrimination for purposes of Title VII. *See Kirkland,* 711 F.2d at 1130–31 (and cases cited therein). This is because a statistical showing of adverse impact creates a presumption of Title VII discrimination, which, if not rebutted by any showing that the contested practice was job-related, requires the court to enter a decree finding unlawful discrimination. *Id.* The court in *Kirkland* also correctly pointed out that the mere fact that the settlement agreement contains disclaimers of any admission of unlawful discrimination does not alter that conclusion, rather, such disclaimers should be construed as an admission of a statistical disparity together with a reservation of the right to explain it in the future. *Id.* at 1131 n. 16. Given this conclusion, it is clear that plaintiffs have shown discrimination on the part of defendant, and, therefore, have demonstrated a basis upon which relief should be granted.

The recent Supreme Court cases dealing with race-conscious affirmative action plans do not alter this conclusion. For example, in *Johnson v. Transportation Agency, Santa Clara County,* —— U.S. ——, 107 S.Ct. 1442, 94 L.E.2d 615 (1987), the Supreme Court held that before an affirmative action plan may be utilized, an employer must find a "manifest imbalance" in a traditionally segregated job category. *Id.* at ——, 107 S.Ct. at 1452, 94 L.Ed.2d at 630–31. This "manifest imbalance," however, need not be such that it would support a *prima facie* case against the employer. *Id.* at ——, 107 S.Ct. at 1452, 94 L.Ed.2d at 631. Since this court has already found that plaintiffs have made out a case of *prima facie* discrimination, clearly then, this requirement for race-conscious relief has been met.

In *United States v. Paradise,* —— U.S. ——, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987), the Supreme Court further held that government bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination. *Id.* at ——, 107 S.Ct. at 1064, 94 L.Ed.2d at 220. This is because the government unquestionably has a compelling interest in remedying past and present discrimination by a state actor. *Id.* at ——, 107 S.Ct. at 1064, 94 L.Ed.2d at 220. Where, as in this case, discrimination has been demonstrated by plaintiffs, the district court is given broad powers to remedy the effects of that discrimination. Clearly then, race-conscious relief of some sort is permissible to remedy the past discrimination shown by the evidence in this case and the use of such relief is not a *per se* violation of either Title VII or the Equal Protection Clause. The court, however, recognizes that any relief it authorizes must be narrowly drawn to achieve the goal of remedying the effect of that past discrimination.

**B. The Terms of the Promotional Relief**

■ The terms of the 240 target position promotional opportunities set aside for

class members has been delineated as follows:

The Consent Decree provides promotional relief to black employees who meet basic eligibility standards for promotion to certain GS, WG, WL, and WS positions, such that Warner Robins will fill 240 specified permanent positions through internal merit promotion processes from among qualified class members. Promotions will be made to every other next available vacancy in the specified positions until the 240 specified positions have been filled.

26. Nothing in the settlement requires Warner Robins to promote or otherwise place any person into a position for which that person is not at least minimally qualified under appropriate Federal Civil Service rules, regulations, and qualifications standards. "Normal basic eligibility requirements" are as defined by the Office of Personnel Management in Handbook X–118 or X–118C.

Only class members hired before January 1, 1980, will be eligible for the above promotional relief.

*Howard v. McLucas,* 597 F.Supp. at 1511 (footnote omitted). In this case, these 240 positions set aside for class members represent, to the best extent possible, the most likely jobs lost to blacks from 1970 through 1979 as a result of the discrimination at Warner Robins. The total number of promotions awarded was derived from the statistical evidence developed in this case by the parties. *See* Proposed Order Granting Final Approval to the Consent Decree, ¶¶ 36–41. The 240 promotional positions set aside are, in fact, a conservative calculation of the actual promotions, as demonstrated by the evidence of record, lost by blacks in the various wage grades at Warner Robins. In addition, the consent decree makes an attempt, to the best extent possible, to fill these positions with personnel that have been identified as actual victims of defendants' discrimination.

To the extent that the promotional relief is targeted to providing a remedy to an actual victim of discrimination, Intervenors' claims that the relief is either unreasonable or unlawful must fail. There is no question that section 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), authorizes relief to victims of an employer's discrimination. Normally, where an employee has been denied a promotion, the remedy will ordinarily include not only back pay, but also an injunction to assure that the one who was unlawfully denied a promotion be given the position improperly denied her. Such an injunction has the effect of giving the victims of discrimination an absolute preference over whites or other non-discriminatee minorities who may subsequently seek the position. *See Ivey v. Western Electric Co.,* 23 Fair Empl.Prac.Cas. (BNA) 1028, 1033–34 (N.D.Ga.1978) [available on WESTLAW, DCT database] (victims identified under claims procedure to be placed on "Priority Promotion List" and be given "the first vacancies available in the affected job categories"); *Hill v. Western Electric Co.,* 13 Fair Empl.Prac.Cas. (BNA) 1157, 1162–64 (E.D.Va.1976) (victims identified by special master to be given "priority offers of promotion, transfer, and hiring"), *aff'd in part and rev'd in part,* 596 F.2d 99 (4th Cir.), *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979); *Stamps v. Detroit Edison Co.,* 365 F.Supp. 87, 121 (E.D.Mich. 1973) (victims to receive "first opportunity to apply for vacancies"; procedure for identifying victims unclear), *rev'd sub nom. EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir.1975), *vacated,* 431 U.S. 951, 97 S.Ct. 2668, 53 L.Ed.2d 267 (1977); *Vogler v. McCarty, Inc.,* 2 Fair Empl.Prac. Cas. (BNA) 491, 494, 497 (E.D.La.1970) [Available on WESTLAW, DCT database] (44 named blacks to be admitted to union and "given priority as to initial referral as employees"), *aff'd,* 451 F.2d 1236 (5th Cir. 1971); *United States v. Medical Society of South Carolina,* 298 F.Supp. 145–56 (D.S. C.1969) (four named blacks to be "given preference over all other applicants for the next four vacancies"). Intervenors contend, however, that no victims have ever been identified in this case, and, in fact, no discrimination has ever been proven. The court has already explained that discrimination has been proven in this case, and, therefore, need not discuss that issue fur-

ther. With respect to the identification of specific victims of defendants' conduct, due to the nature of the promotional system at Warner Robins, it is impossible to identify with surgical precision the specific blacks affected by that system. Nevertheless, the Supreme Court has never required such precision, and has acknowledged that "the process of recreating the past will necessarily involve a degree of approximation and imprecision." *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977). As already pointed out, the positions set aside represent the most likely jobs lost by blacks from 1971 through 1979. In addition, plaintiffs and defendants have attempted to place the most likely victims of discrimination in these positions by establishing certain criteria to determine who will receive one of the 240 promotions. In order to accomplish this task, special promotion registers were compiled to implement the relief. These registers were created by applying a three part test: (1) the class member must first meet the normal, basic eligibility requirements for the position sought (Consent Decree, ¶ 12(b)(1)); (2) the class member must have higher supervisory ratings in late 1984 than other blacks evaluated by the same supervisor, *Id.;* and (3) the seniority of the employee as determined by his service computation date must be considered. *Id. See also* Proposed Order Granting Final Approval to the Consent Decree, ¶ 36–41 which details methodology used to identify jobs lost to blacks. By using these factors, the most presently qualified class member is thus eligible for one of the special promotions, and, assuming that this same person has performed similarly in the past, he/she is more than likely an actual victim of defendants' discriminatory conduct. A more specific way of identifying these actual victims does not exist in this case.

Both plaintiffs and defendants agree that due to the promotional system in place during the relevant time period, sufficient records were not maintained to identify class members that were excluded from consideration for promotion unfairly. Only the names of candidates found to be qualified for promotion were maintained. *Howard v. McLucas,* 597 F.Supp. at 1508–09. Furthermore, the promotional system at Warner Robins required no individual to formally apply for a position since all employees were considered for each promotion. Plaintiff class members, therefore, cannot even testify that they applied for a promotion but were turned down. Based upon these facts, the court finds that the best method of determining the actual victims of defendants' discrimination has been utilized in the consent decree.

Intervenors point to certain alleged deficiencies in the statistics used to develop the promotional registers. First, they contend that the service computation date (SCD), which is used to determine seniority, does not accurately indicate in all cases an employee's true length of service. While it is true that the SCD does not literally define the length of employment at Warner Robins, this method has been approved by the Air Force as the designated seniority measure for ranking purposes in the regular merit promotion system. *See* Defendants' Pre–Trial Proposed Findings of Fact and Conclusions of Law, ¶ 54. In addition, the evidence indicates that employees with the earliest SCD's are more likely to have been employed the longest at Warner Robins. Supp.Wooley Aff., ¶ 7. Given these facts, the court is not convinced that the method used to determine seniority is so unreliable as to warrant the use of an alternative method.

Second, Intervenors contend that the victim identification procedure fails to consider the length of time a class member was in a source position, and, further, that it fails to determine whether that class member was ever in a source position during the relevant time period. As a result of this, Intervenors argue that those employees who have been in a source position throughout all or most of the relevant period will not be treated fairly when determining their seniority ranking. With respect to the contention that an employee, during the relevant time period, may not have ever been in one of the affected source positions

wherein pervasive discrimination has been found, the court finds that the consent decree, to the best extent possible, has attempted to identify and promote only those class members who were most likely passed over for promotion into one of these source positions during the relevant period. This result has been achieved by way of a two-fold process: (1) the special promotional relief is limited to only those black employees who were in an appropriated fund career or career-conditional position for any time during the period of March 24, 1972, through December 31, 1979; and (2) the class member must also demonstrate the basic eligibility, seniority, and supervisory criteria, as described *supra*, p. 14, before he can be promoted into one of these positions. This process, therefore, considers only employees of Warner Robins that were employed during the relevant period wherein the court found evidence of discrimination. Further, by presently meeting the basic eligibility requirements for one of the special promotions, and by requiring the most senior and best rated class member be promoted first, as determined by the supervisory and SCD ratings, it becomes likely that this same employee has been eligible for that same promotion for a considerable period of time; that this period of time likely extends back into the period during which discrimination has been demonstrated; and that, therefore, he/she is a likely victim of discrimination entitled to relief. Accordingly, the court finds that given the unavailability of any government documents that show which class members were passed over for promotion during the relevant time period, the method of identification utilized in the consent decree is the best alternative identification system available.

As to Intervenors' objection that the consent decree does not take into account the length of time a class member was exposed to defendants' discrimination, the court sees no reason why the length of discrimination should be a factor in determining seniority ranking for class members. Discrimination in these source positions was pervasive throughout the entire period. Even if the class member was exposed to this discrimination for only a short while, discrimination of a short-term nature is equally redressable as that of a long-term nature. While the court recognizes that theoretically, at least, a lesser aggrieved class member may be afforded relief over a more aggrieved class member under the present identification process, both class members are entitled to relief. Intervenors simply do not have standing to object to this unavoidable shortfall in the identification process. Further, where the promotional process in place at Warner Robins during the relevant time period offers little help in determining who the actual victims of discrimination are, it is not unreasonable for class members to settle on a promotional relief scheme that potentially may result in incidents of more serious discrimination being overlooked in favor of less egregious, but equally serious under the law, incidents of discrimination being remedied.

Thirdly, Intervenors contend that the seniority ranking system fails to take into account special circumstances such as leaves of absence taken by employees. Intervenors' Brief, p. 30. The court is simply not persuaded that the failure to take into account these circumstances will render the seniority ranking system unfair or unduly inaccurate. The evidence is clear that only class members employed during the relevant period have become eligible for one of the special promotions. Furthermore, plaintiffs' statistics have demonstrated consistent disparities throughout the 1971 to 1979 period, and, therefore, a class member employed during any of that period, who also meets the other identification criteria, is more than likely a victim of defendants' discrimination. Accordingly, the court finds the victim identification process utilized in the consent decree to be a reliable and narrowly tailored process designed to assure that only victims of discrimination be afforded relief. This conclusion is not changed by Intervenors' "random case history analysis." Intervenors have failed to show that any of these class members were not victims of defendants' discrimination. All were at Warner Robins for at least a

portion of the 1972–1979 period, and all were qualified for the promotions they received. To the extent that a lesser qualified victim was promoted before a more qualified victim, Intervenors simply do not have standing to object since, as already stated, *all* victims of discrimination are entitled to full relief from this court.

Finally, Intervenors assert that the government has willfully destroyed records during the pendency of this litigation that might have aided in the identifying of the actual victims of discrimination. *See* Intervenors' Brief, p. 23. The record is devoid of any evidence of such destruction and, in fact, the evidence clearly indicates that the lack of evidence stems solely from the institutional procedures set up by Warner Robins prior to the initiation of this lawsuit. Being a frivolous argument, the court need not address it further.

In conclusion, the promotional relief provided for in the consent decree is designed to compensate actual victims of defendants' discrimination. While the identification process is not flawless, it is, in the court's best judgment, a reasonable and fair identification procedure designed to choose the most likely victims of discrimination. It is further clear that a plaintiff in a Title VII case is not required to establish with certainty the identity of every actual victim. *See International Brotherhood of Teamsters,* 431 U.S. at 371–72, 97 S.Ct. at 1873, and *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976). The burden on a plaintiff is merely to establish the identity of the group of individuals at which the discriminating practice was directed. *Id.* This plaintiffs have clearly done. Once so identified, this group of individuals is, in turn, entitled to full compensatory relief, *i.e.,* the promotions that they were otherwise entitled to but for the discrimination. By settling their dispute, plaintiffs have actually minimized the potential impact on Intervenors since it appears from all of the evidence that there were potentially more than 240 class members that were not promoted on the basis of race. For cases demonstrating this larger impact on Intervenors, *see United States v. Lee Way Motor Freight,* 625 F.2d 918, 935–36 (10th Cir.1979) (wherein an employer had promoted eight apprentices, all white, to journeymen in the years between 1965 and 1972. Six identified victims were awarded vacancies. Lee Way objected on appeal that since only 8.5% of the area population was black, only one black would have been hired in the absence of discrimination, and, therefore, only one black should have been given a hiring preference. The Tenth Circuit rejected this argument holding that the decision in *Teamsters* required full relief to be provided all identified victims); *see also Mims v. Wilson,* 10 Fair Empl.Prac.Cas. (BNA) 1357, 1358 (N.D.Fla.1973), *vacated,* 514 F.2d 106, 109 n. 5 (5th Cir.1975) (wherein the area population was only 7.2% black, and defendant employer employed fewer than 20 workers. The court held that providing relief to only two class members was improper because the relief provided stopped short of returning the black discriminatee to his "rightful place").

By limiting the number of promotions to the number of positions actually lost, the consent decree's relief has equitably balanced the difficulty of identifying all victims of discrimination through a lengthy trial with the interests of subsequent non-discriminatee applicants in being able to pursue their careers without being affected by any rightful promotional relief that is provided to these victims. The victim identification procedure is targeted to a pool of likely victims that has been formulated in such a way as to maximize the probability that the class members chosen were, in fact, victims. To the extent that the relief provided class members is either over or underinclusive is simply unavoidable due to the difficulty of victim identification in this case and due to Title VII's mandate that full compensatory relief be provided victims. *See generally,* Schnapper, *The Varieties of Numerical Remedies,* 39 STAN.L. REV. 851, 893–900 (1987). Further, the fact that less qualified discriminatees may be chosen over more qualified discriminatees is simply not a concern Intervenors may raise since they lack standing with regard to that issue. Accordingly, because

the court finds that the 240 special promotional positions is victim specific, Intervenors' contentions that this relief violates Title VII and the Constitution is simply meritless. The promotional relief is not only lawful, it is also a fair, adequate, and reasonable remedy for the class members when combined with the additional remedies provided for in the consent decree.

## C. Alternative Rationale for Promotional Relief

■ While the court is fully persuaded that only identified victims of discrimination will benefit from the promotional relief provided for in the consent decree, the court alternatively finds that, even assuming that the promotional relief in this case is a purely race-conscious affirmative action program designed to benefit victim and non-victim class members alike, the relief so provided would still pass statutory and constitutional muster. Where, as in this case, plaintiffs have demonstrated a *prima facie* case of discrimination, non-victim race-conscious relief is clearly authorized under both Title VII and the Constitution. As already stated, in order for non-victim race-conscious relief to be permissible, the Supreme Court's most recent pronouncements clearly indicate that an affirmative action plan must merely be designed to eliminate work force imbalances in traditionally segregated job categories. *Johnson,* — U.S. at —, 107 S.Ct. at 1451, 94 L.Ed.2d at 630. Plaintiffs have presented numerous statistical studies of work force, grade levels, occupational segregation, promotions, training, supervisory appraisals, test scores, and awards that demonstrate pervasive patterns of discrimination in the internal promotional system at Warner Robins.[1] Given this factual background, the court can but only conclude that the requisite "manifest imbalance" has been amply shown by plaintiffs in this case. Finding this part of the test to have been met, the court must next address whether the promotional relief unnecessarily trammels the rights of white employees or creates an absolute bar to their advancement.

Where a race-preference program is justified by a need to remedy prior discrimination, the program itself must still be narrowly tailored to the achievement of that goal. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, —, —, 106 S.Ct. 1842, 1846, 1849, 90 L.Ed.2d 260, 268, 272 (1986) (It is of central importance to equal protection under law that public distinctions between citizens on the basis of their race be narrowly and specifically framed to accomplish the stated remedial purpose). While the standard for evaluating challenges to plans appear to vary depending upon whether it is brought under Title VII or the Constitution, the primary concern under both analysis is that the remedial efforts must ensure fair treatment of whites and blacks, males and females. A review of the terms of the promotional relief is, therefore, necessary.

As already indicated, the promotional relief is ephemeral in nature. Once the promotions are made, no other special promotions are required. The process of filling the remaining 71 positions will probably take much less than a year, if the previous promotional rate continues,[2] and no further promotional relief is provided for in the decree. The plan is, therefore, of relatively short duration with minimal intrusion upon the generalized expectation of Intervenors in being promoted.[3]

---

1. These studies were based on either admitted facts, discovery documents, or Warner Robins' computer files.

2. In the ten months that the decree was in effect, 169 of the 240 special promotions were made.

3. This court has previously found that Intervenors have no vested right or entitlement to a promotion under the Warner Robins promotion process. This court has found that:

Warner Robins does not operate under a seniority system. A complicated computer ranking process screens all employees for potential promotions. No job announcements are posted. Employees do not apply for promotions, and no employee has an enforceable basis for considering himself as "next in line" for any future opening. Clearly, the Consent Decree does not impair any vested rights of [intervenor].

*Howard v. McLucas,* 597 F.Supp. 1501, 1503 (M.D.Ga.1984).

The promotional relief is also flexible, and waivable in nature given the fact that promotions will be made to every other next available vacancy in the specified positions until the 240 specified positions have been filled. *Howard*, 597 F.Supp. at 1511. In addition, nothing in the consent decree requires Warner Robins to promote or otherwise place any person into a position for which that person is not at least minimally qualified under the applicable federal standards, nor is the government required to make a promotion unless one is necessary. *Id.* The one for one requirement in this case does not require the layoff or discharge of any white employees. Rather, it merely postpones the promotions of a relatively few qualified whites to a limited number of specified positions. These same white employees may continue to seek a promotion in one of the target positions on an every other basis, as well as a promotion in any one of the other non-target positions at Warner Robins. For example, during the 22 months that the special registers were in use (from December 20, 1984, until the issuance of the Eleventh Circuit's mandate on October 23, 1986), there were 3,909 competitive promotions at Warner Robins. *See* Supp.Wooley Aff., ¶ 3. The 169 special promotions made during that period, therefore, comprised a mere 4.3% of the total number of promotions made at Warner Robins. Furthermore, the record further indicates that a majority of the Intervenors claiming eligibility for target positions have actually received promotions.[4] These facts lead the court to conclude that the impact of the special promotions on Intervenors is relatively diffuse.

The promotional relief in the consent decree is also only directed to the various wage grades where pervasive discrimination has been shown. In these wage categories, the effect of defendants discrimination has been to create a stigma upon the members of the plaintiff class that they are less than capable of performing the same work similarly performed by non-class members there at Warner Robins. By placing qualified class members into these positions as soon as possible, this stigma will dissipate, as will the likelihood of future discrimination. The court believes that the accellerated relief provided by the one for one promotional system is, therefore, plainly justified, especially when considering the decade-long delay that has occurred in this case, through no fault of the parties, but which has allowed the effects of discrimination to continue to pervade throughout the Warner Robins workforce. Under these circumstances, the court does not believe that a mere racial preference similar to the "Harvard Plan" would provide the full relief necessary to remove promptly the remaining vestiges of discrimination at Warner Robins. Nor has the court been presented with any other less intrusive approach that might provide full relief to class members within a reasonable period of time.

After a full review of the evidence in this case and the objections of Intervenors, the court finds that the special promotional relief provided for in the consent decree does not violate either the Fifth Amendment to the Constitution or section 703(a) of Title VII, 42 U.S.C. § 2000e–2(a) (1981), because it is based upon a predicate finding of discrimination by defendants and is victim

---

**4.** As of July, 1984, there were 137 Intervenors identified by name. *See* Exhibit A of Intervenors' Motion To Intervene. Intervenors have not amended this list as of the date of this decision. *See* Defendants' Opposition To Intervenors' Motion For Permanent Vacation Of Promotion Provisions Of Consent Decree, pg. 10 fn. 3. Defendants have presented evidence that of the 137 named Intervenors, forty-three (43) have subsequently been promoted with thirteen (13) of these promotions occurring prior to the initial special register promotions under the consent decree; forty (40) are not eligible for promotion to any of the target positions; one

(1) claimed eligibility for a position she already held; five (5) subsequently requested changes to lower grades in other occupations, thereby indicating that they did not aspire to one of the target positions, and ten (10) are no longer employed by Warner Robins. *See* Supp.Wooley Aff., ¶ 6; and Defendants' Opposition To Intervenors' Motion For Permanent Vacation Of Promotion Provisions Of Consent Decree, p. 10. Intervenors do not dispute these figures, rather, they merely assert that they are irrelevant so long as one Intervenor is eligible for a target position.

specific. Further, to the extent the relief is not victim specific, it is still lawful since it is necessary to provide full relief to class members, it is flexible, waivable, and of limited duration; the number of positions offered is limited to the specific number of jobs statistically proven to have been lost to class members; and, finally, it does not unnecessarily trammel the rights of third parties or create an absolute bar to their advancement since the impact of the relief is relatively diffuse in nature and many promotional opportunities continue to exist for these third parties. Because the court has found the disputed promotional relief to be lawful, this court's previous findings that the non-promotional relief found in the amended consent decree is fair, adequate, and reasonable to the parties now requires that the entire decree as proposed be accepted by the court. Accordingly, FINAL APPROVAL should be and is hereby GRANTED. Fed.R.Civ.P. 23(e).

SO ORDERED.