Michael HOWARD, et al.,
Plaintiffs–Appellees,

v.

John L. McLUCAS, et al.,
Defendants–Appellees,

Robert Poss, et al.,
Intervenors–Appellants.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,
et al., Plaintiffs–Appellees,

v.

John C. STETSON, etc.,
Defendant–Appellee,

Robert Poss, et al.,
Intervenors–Appellants.

No. 87–8817.

United States Court of Appeals,
Eleventh Circuit.

April 27, 1989.
Rehearing and Rehearing En Banc
Denied June 2, 1989.

district court that the consent decree either had or would have an adverse impact upon any of their promotional expectations. Nonetheless, because this court specifically granted the intervenors the right to challenge the promotional remedy portion of the consent decree, we address the constitutionality of that relief. We agree with the district court, see *Howard v. McLucas*, 671 F.Supp. 756, 762–67 (M.D.Ga.1987) (*Howard IV*), that the promotional relief is not unlawful, and affirm its approval of the consent decree.

Hunter R. Hughes, Rogers & Hardin, Atlanta, Ga., Edward T.M. Garland, The Garland Firm, P.C., Robin L. Kurtzman, Atlanta, Ga., for plaintiffs-appellees.

John L. Lynch, Asst. U.S. Atty., Dept. of Justice, U.S.DOJ, Macon, Ga., Peter R. Maier, Justice Dept., Civil Div., John F. Cordes, Washington, D.C., Bill Lann Lee, Elizabeth M. Brown, Los Angeles, Cal., for defendants-appellees.

Before RONEY, Chief Judge, CLARK, Circuit Judge, and MORGAN, Senior Circuit Judge.

CLARK, Circuit Judge:

This is the second time this case has been before us. In *Howard v. McLucas*, 782 F.2d 956, 960–61 (11th Cir.1986) (*Howard III*), we held that white and nonminority employees (the intervenors) at the Warner Robins Air Logistics Center (Warner Robins) could intervene to challenge race-conscious promotional relief in a consent decree entered into by black employees (the plaintiffs) at Warner Robins and the Secretary of the Air Force and others (the government). We admit that the issue presented in this appeal is problematic. While we decide the question of whether the promotional relief violates either Title VII of the Civil Rights Act of 1964 or the Fifth Amendment, we do so with the explicit recognition that the intervenors did not, on remand, present any evidence to the

## I. BACKGROUND

### A. Facts

Warner Robins, which is part of the Air Force Logistics Command, is located at Robins Air Force Base near Macon, Georgia. It employs 15,000 civilians to manage logistics for assigned aircraft and commodities, repair aircraft and technologies, receive, store, issue, and transport spare parts and systems, and award annual contracts for Air Force procurement responsibilities. *Howard v. McLucas*, 597 F.Supp. 1504, 1508 (M.D.Ga.1984) (*Howard II*).

Warner Robins' blue collar employees are classified under the Wage Grade (WG) pay plan, which has fourteen grade levels.[1] Its white collar employees are classified under the General Schedule (GS) pay plan, which has sixteen grade levels. Under Warner Robins' internal promotion policy, employees in lower grades receive the first opportunity to fill higher level positions. Except for job openings at GS 14 and above, all employees at Warner Robins are initially considered for all vacancies. *Id.* at 1508–09; Fairness Hearing, Record, Vol. II at 61 (testimony of Gary Carter, Civilian Personnel Officer at Warner Robins). Candidates for competitive promotions at Warner Robins are identified through the use of skills locator systems which, unlike announcement or posting systems, do not re-

---

1. Employees in WG 1–4 generally perform unskilled labor. Employees in WG 5 are helpers in skilled mechanical trades or full performance journeymen in other fields of work. Employees in WG 6 are ordinary journeymen outside the skilled mechanical trades. Employees in WG 7–8 are journeymen or have intermediate positions in skilled mechanical trades. Employees in WG 9–11 are journeymen in skilled mechanical trades. Record, Vol. 5, Tab 285 at 3.

quire employees to apply to fill an individual vacancy. The E426 system, which was used until 1978, generated promotion registers of all qualified candidates and ranked the candidates based on qualification requirements. Under the E426 system, primary factors such as experience, written examinations, and written appraisals were used to determine basic eligibility for a promotion, while secondary factors such as awards and self-development activities were used to determine the final ranking within a register and evaluate the top five candidates. The PPRS system, which replaced the E426 system, screens all employees for potential eligibility on the basis of such factors as pay, type of appointment, and basic skills from information entered into a computer through a comprehensive series of skills code. Employees who satisfy the test of basic eligibility are then subject to progression level ranking. The number of progression levels is determined by the type and grade of the position to be filled. Each progression level contains up to five factors identifying general and specific skills, knowledge, and characteristics. Advancement from one level to another occurs only when the requirements of the previous level have been satisfied. A series of tiebreakers—which include supervisory appraisals, awards, and seniority—are used to rank employees within a given level and generate promotion registers which usually last ninety days. *Id.*

Consonant with the operation of a skills locator system, employees at Warner Robins do not apply for promotions and are not notified that they have been considered for vacancies unless they are at the top of a register. The E246 and PPRS systems do not maintain records of employees who are initially considered for a specific promotion. The systems only generate records of candidates who are found to be qualified. *Id.* at 1509. Under both systems, only the most current supervisory appraisals are used, and as they are updated, the old appraisals are destroyed. There are therefore no existing supervisory appraisals for the 1971–1978 period. Record, Vol. 5, Tab

285 at 8. Because test scores are maintained only for current examinations and many examinations used by Warner Robins prior to 1979 have been discontinued, test score data for the 1971–1978 period is incomplete. *Id.*

### B. Proceedings Leading to a Consent Decree

In 1975 the plaintiffs [2] filed an action against the government, seeking injunctive and monetary relief to redress alleged discriminatory employment practices at Warner Robins. Evidence garnered by the plaintiffs indicated that blacks "were concentrated in low level jobs and certain occupations." *Howard II*, 597 F.Supp. at 1513. In 1973, the average grade of white WG employees was 9.2, while the average grade of black WG employees was 6.7. In 1975, the average grade of white WG employees was 9.3, while the average grade of black WG employees was 6.8. *Id.* at 1510. Despite comprising approximately 15% of the workforce at Warner Robins, blacks constituted 86% of all janitors, 81% of all laborers, 76% of all packers, 76% of all motor vehicle operators, 71% of all woodcrafters, and 67% of all parts and equipment operators. Fairness Hearing, Record, Vol. II at 27.

Statistics compiled by the plaintiffs "demonstrated that black employees were promoted in proportions less than their representation in the workforce or in lower grades." *Howard II*, 597 F.Supp. at 1510. In 1973, 14.5% of minority employees received supervisory appraisals below 80, while only 6.2% of nonminority employees received such appraisals. In 1979, 38.3% of black employees received supervisory appraisals over 96, while 49% of white employees received such appraisals. Fairness Hearing, Record, Vol. II at 29–30. The plaintiffs' initial statistical analysis showed disparities in promotion rates out of grade in WG 1–4 (6.01 standard deviations—67.98 expected promotions lost), WG 5–8 (16.03 standard deviations—362 expected promotions lost), WG 9–12 (4.08 standard devi-

---

**2.** The plaintiffs' class, which numbers approximately 3,200, consists of blacks who were employed at Warner Robins during the 1972–1979 period. *Howard III*, 782 F.2d at 958 & n. 2.

ations—50.06 expected promotions lost), and GS 1-4 (3.56 standard deviations—72.-67 promotions lost).[3] From this analysis the plaintiffs concluded that blacks at Warner Robins had lost a total of 553 promotions during the 1971–1979 period. *Howard II,* 597 F.Supp. at 1510. A more conservative analysis, controlling for occupational series, showed smaller disparities in promotion rates out of grade in WG 1-4 (3.53 standard deviations—36.68 expected promotions lost), WG 5-8 (8.19 standard deviations—162.84 expected promotions lost), and WG 9-12 (3.75 standard deviations—34.74 expected promotions lost). From this more conservative analysis, the plaintiffs concluded that blacks at Warner Robins had lost a total of 234 promotions during the 1971–1979 period. *Id.*

In 1984, after years of litigation, the parties entered into a consent decree, which was meant to ensure "that black employees were promoted internally [at Warner Robins] on a fair and equal basis." Consent Decree, Record, Vol. 4, Tab 256 at 5.[4] The decree awards $3.75 million in back pay to the plaintiffs and provides that 240 of the plaintiffs are to be promoted into 38 target positions (in WG 3-11) from special promotion registers made up only of qualified plaintiffs.[5] The special promotion registers are to be created by ranking plaintiffs who are qualified under Federal Civil Service standards and meet "basic eligibility requirements" by equally weighing seniority and supervisory appraisals. The 240 promotions alternate with general promotions so that every other promotion to the target positions is from the special promotion registers. The decree limits the 240 race-conscious promotions at Warner Robins to the 38 target positions. *Id.* at 7–9 & Exhibit A.

### C. The Challenge to the Consent Decree

The district court, after denying the intervenors leave to intervene, *see Howard v. McLucas,* 597 F.Supp. 1501, 1504 (M.D.Ga. 1984) (*Howard I*), approved the consent decree in *Howard II.* We reversed the district court's decision in *Howard I* and remanded the case to the district court, holding that the intervenors were entitled to intervene, but only in order to challenge certain portions of the consent decree:

> [The] [i]ntervenors are limited to challenging the portion of the remedy that reserves 240 target position promotional opportunities to [the plaintiffs]. They have no standing to contest the existence of past discrimination or any other issue concerning the merits of the dispute and no standing to contest the backpay award or veto remedial measures in general. The only issue [the] intervenors shall be permitted to raise on remand is their contention that [they] will not be considered for promotion to the 240 target positions on an equal basis with non-discriminatee black employees solely on account of race.

*Howard III,* 782 F.2d at 960–61. We also recognized that the intervenors failed to show any direct injury as a result of the promotional remedy. We nonetheless held that they should be heard on the issue: "If the implementation [of the promotional remedy] would have an adverse impact upon the promotional expectations of intervenors, they should be granted the opportunity to demonstrate that and should be heard in opposition to these provisions." *Id.* at 961 n. 5. Finally, we suggested that the district court determine whether the

---

**3.** Fluctuations of more than 2 or 3 standard deviations undercut the hypothesis that selections for promotions were being made randomly without regard to race. *See Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977).

**4.** The consent decree provided that the government's settlement of the litigation did not constitute an admission of liability for past or present discrimination. Consent Decree, Record, Vol. 4, Tab 256 at 2.

**5.** The figure of 240 promotions was determined by using positions in WG 2, WG 5-6, WG 8, and WG 10 as source grades. The 240 promotions were then apportioned across target positions to which blacks could be expected to be promoted, based on historical career progression patterns at Warner Robins, to determine the most likely jobs lost by blacks during the 1971–1979 period. Once the jobs lost by blacks had been identified, the occupational series for those jobs were identified based on the projection of vacancies at Warner Robins in 1982 and 1983. Record, Vol. 5, Tab 285 at 16.

intervenors' claims, or any part thereof, had become moot because of the implementation of the decree's promotional relief. *Id.* at 961 n. 4.

On remand, the intervenors mounted a two-pronged attack on the promotional relief in the consent decree. First, they argued that there was no basis for the promotional relief because the plaintiffs had not demonstrated any discrimination by the government and the government had not admitted any discrimination on its part. Second, they argued that even if discrimination had been shown, the promotional relief was unlawful.

Before addressing the intervenors' arguments, the district court held that the propriety of the promotional relief had been mooted to the extent that the targeted positions had been filled. According to the district court, by the time we issued our opinion in *Howard III*, 169 of the positions had been filled. *Howard IV*, 671 F.Supp. at 758. As to the intervenors' first contention, the district court, pointing to its previous findings of facts in *Howard II*, 597 F.Supp. at 1509–10, held that the plaintiffs had "made out a *prima facie* case of employment discrimination through the use of statistical evidence of disproportionate racial impact." *Howard IV*, 671 F.Supp. at 760. The district court also held that for purposes of Title VII the fact that the government had entered into the decree without rebutting the plaintiffs' *prima facie* case amounted to an admission of unlawful discrimination. *Id.* at 761 (citing *Kirkland v. New York State Dept. of Correctional Servs.*, 711 F.2d 1117, 1130–31 (2d Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984)). As to the intervenors' second contention, the district court first held that the promotional relief was not unlawful because it provided a remedy to actual victims of discrimination: the consent decree utilized the best method of determining actual victims in light of the fact that the skills locator systems did not require any employees at

Warner Robins to apply for promotions. *Id.* at 762–66. The district court then held that the promotional relief was narrowly tailored because it was directed only toward the grades where pervasive discrimination had been shown, was "ephemeral in nature," and was flexible in that the remedial promotions given to qualified plaintiffs were made to every other next available vacancy in the specified positions. The district court also found that the relief did not unnecessarily trammel the intervenors' rights because the 169 promotions which had already been given to qualified plaintiffs since the implementation of the decree constituted only 4.3% of the total number of promotions made at Warner Robins during that period of time. *Id.* at 766–67.[6] Finally, the district court held that a mere racial preference would not provide the "full relief necessary to remove promptly the remaining vestiges of discrimination at Warner Robins." *Id.* at 767.

### D. The Intervenors' Standing

■ Before commencing a discussion of the constitutionality of the promotional relief portion of the consent decree, we feel it incumbent upon us to address the confusion that the intervenors' challenge has engendered. Traditionally, a party seeking intervention must demonstrate a "direct, substantial, legally protectable interest in the proceeding" before that party will be granted intervenor status. *See, e.g., Athens Lumber Company, Inc. v. Federal Election Commission*, 690 F.2d 1364, 1366 (11th Cir.1982). The intervenors were not and have not been certified as a class. Thus, they should demonstrate some cognizable injury to themselves in order to challenge the consent decree.

As noted above, our earlier opinion granting the right to intervene recognized that the intervenors were not relieved of their burden of demonstrating that the promotional remedy would have an adverse impact on their promotional expectations.

---

**6.** In discussing the impact of the promotional relief on white employees, the district court also noted that 43 of the 137 named intervenors had been promoted and that another 56 were not eligible for promotions to the target positions for one reason or another. *Howard IV*, 671 F.Supp. at 767 n. 4.

In addition, our earlier opinion specifically stated that the intervenors could only challenge the promotional relief on the basis that "[*they*] *will not be considered for promotion* to one of the 240 targeted positions on an equal basis ... *solely* on account of race." *Howard III,* 782 F.2d at 961 (emphasis added). On remand to the district court, however, the intervenors presented no evidence of injury. The district court noted:

> As of July, 1984, there were 137 Intervenors identified by name. Defendants have presented evidence that of the 137 named Intervenors, forty-three (43) have subsequently been promoted ...; forty (40) are not eligible for promotion to any of the target positions; one (1) claimed eligibility for a position that she already held; five (5) subsequently requested changes to lower grades in other occupations, thereby indicating that they did not aspire to one of the target positions, and ten (10) are no longer employed by Warner Robins. Intervenors do not dispute these figures, rather, they merely assert that they are irrelevant so long as one Intervenor is eligible for a target position.

671 F.Supp. at 767 n. 4 (Record Cites omitted).

The intervenors' above argument to the district court is misplaced because they did not present *any evidence* that any one of them otherwise eligible for a target position was denied that position. Employment, in and of itself, does not confer the right to challenge an affirmative action plan. For example, in *In re Birmingham Reverse Discrimination Employment Litigation,* 833 F.2d 1492 (11th Cir.1987), an opinion that postdates our remand in this case, we held that claims that a consent decree resulted in reverse discrimination could not accrue until those seeking redress were denied promotions. *Id.* at 1498–99.

Although the intervenors in this case argue they have suffered injury because those among their ranks who received promotions necessarily received them later than they normally would have due to the structure of the promotional remedy, none of the intervenors have presented evidence on the issue. In addition, the intervenors' claim of delay is undercut in light of the fact that all those who have been promoted have received their promotions within a short time period resulting in a marginal effect on whites, if any. We recognize, however, that *a fortiori* some delay may have occurred. *See Howard IV,* 671 F.Supp. at 767. Therefore, despite the intervenors' tenuous position to contest the consent decree, we proceed to discuss the constitutionality of the promotional remedy in accordance with our previous opinion granting the intervenors leave to launch such a challenge.

## II. THE MERITS

### A. Standard of Review

In the past several years, the Supreme Court has had three opportunities to address the constitutionality of race-conscious programs or orders.[7] *See United States v. Paradise,* 480 U.S. 149, 169–85, 107 S.Ct. 1053, 1066–74, 94 L.Ed.2d 203 (1987) (plurality opinion) (upholding temporary district court order requiring that equal number of blacks and whites be promoted to state trooper positions whenever promotions were required because order was necessary to ensure compliance with previous decrees and did not require gratuitous promotions); *Local 28 v. EEOC,* 478 U.S. 421, 475–79, 106 S.Ct. 3019, 3050–52, 92 L.Ed.2d 344 (1986) (plurality opinion) (upholding temporary district court order imposing nonwhite membership goal on union and its apprenticeship committee because order was necessary to combat the linger-

---

**7.** Attempts by nonminority employees to challenge consent decrees which provide for race-conscious relief have engendered a good deal of academic commentary. *See, e.g.,* Cooper, *The Collateral Attack Doctrine and the Rules of Intervention: A Judicial Pincer Movement on Due Process,* 1987 U.Chi.Legal F. 103; Schwarz-

schild, *Public Law by Private Bargain: Title VII Consent Decrees and the Fairness of Negotiated Institutional Reform,* 1984 Duke L.J. 887; Note, *Voluntary Public Employer Affirmative Action: Reconciling Title VII Consent Decrees with the Equal Protection Claims of Majority Employees,* 28 B.C.L.Rev. 1007 (1987).

ing effects of past discrimination, was not used to achieve and maintain racial balance, and had only a marginal effect on whites); *Wygant v. Jackson Bd. of Education,* 476 U.S. 267, 274–84, 106 S.Ct. 1842, 1847–52, 90 L.Ed.2d 260 (1986) (plurality opinion) (striking down school board's policy of extending preferential protection against layoffs to minority employees because alternative means of remedying present effects of past discrimination, such as hiring goals, were available). Despite these recent opinions, the Supreme Court has yet to establish the standard by which to review equal protection challenges to governmental affirmative action programs. *See Paradise,* 107 S.Ct. at 1064. Some members of the Court believe that the remedial use of race is permissible only if it is justified by a compelling governmental interest and the means chosen to effectuate the government's purpose are narrowly tailored. *See Wygant,* 106 S.Ct. at 1846 (opinion of Powell, Rehnquist, Burger, and O'Connor, JJ.). Others contend that it is permissible if it serves important governmental objectives and is substantially related to the achievement of those objectives. *See Regents of University of California v. Bakke,* 438 U.S. 265, 359, 98 S.Ct. 2733, 2783, 57 L.Ed.2d 750 (1978) (opinion of Brennan, White, Marshall, and Blackmun, JJ.). Justice O'Connor has observed, however, that

> the disparities between the two tests do not preclude a fair measure of consensus. In particular, as regards certain [governmental] interests commonly relied upon in formulating affirmative action programs, the distinction between a "compelling" and an "important" governmental purpose may be a negligible one. The Court is in agreement that, whatever the formulation employed, remedying past or present racial discrimination by a [government] actor is a sufficiently weighty [governmental] interest to war-

rant the remedial use of a carefully constructed affirmative action program. *Wygant,* 106 S.Ct. at 1853 (O'Connor, J., concurring in part and concurring in the judgment).[8]

We need not delineate what standard of review should be employed, for we find that on this appeal the promotional relief in the consent decree "survives even strict scrutiny analysis: it is 'narrowly tailored' to serve a 'compelling governmental purpose.'" *Paradise,* 107 S.Ct. at 1064. Before addressing the merits, we emphasize that the intervenors bear the burden of proving that the promotional relief is unconstitutional. *Wygant,* 106 S.Ct. at 1848.

**B. Compelling/Important Interest**

The consent decree in this case "must be considered equivalent to a voluntary affirmative action plan for purposes of equal protection analysis." *Birmingham Reverse Discrimination,* 833 F.2d at 1501 n. 23 (11th Cir.1987). Before a public employer such as the government embarks on an affirmative action program, it must have "convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination." *Wygant,* 106 S.Ct. at 1848. But a "contemporaneous or antecedent finding of past discrimination by a court or other competent body is not a constitutional prerequisite to a public employer's voluntary agreement to an affirmative action plan." *Id.* at 1855 (O'Connor, J., concurring in part and concurring in the judgment), 1863 (Marshall, Brennan, and Blackmun, JJ., dissenting), 1867 (Stevens, J., dissenting). As Justice O'Connor has explained,

> [t]he imposition of a requirement that public employers make findings that they have engaged in illegal discrimination before they engage in affirmative action programs would severely undermine public employers' incentive to meet voluntar-

---

**8.** The due process clause of the Fifth Amendment contains an equal protection component. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Although *Local 28, Wygant,* and *Paradise* involved state affirmative action programs challenged under

the equal protection clause of the Fourteenth Amendment, they are fully applicable in this case because the equal protection guarantee of the Fifth Amendment is co-extensive with that of the Fourteenth Amendment. *Paradise,* 107 S.Ct. at 1064 n. 16.

ily their civil rights obligations. This result would clearly be at odds with [the Supreme] Court's and Congress' consistent emphasis on "the value of voluntary efforts to further the objectives of the law." The value of voluntary compliance is doubly important when it is a public employer that acts, both because of the example its voluntary assumption of responsibility sets and because the remediation of governmental discrimination is of unique importance.

*Id.* at 1855 (O'Connor J., concurring in part and concurring in the judgment). Thus, when a public employer's affirmative action program or a consent decree providing race-conscious relief is challenged as unconstitutional, the district court "must make a factual determination that the [public] employer had a strong basis in evidence for its conclusion that remedial action was necessary." *Id.* at 1848. Once the public employer

> introduces its statistical proof as evidence of its remedial purpose, thereby supplying the [district] court with the means for determining that [it] had a firm basis for concluding that remedial action was appropriate, it is incumbent upon the nonminority [employees] to prove their case; they continue to bear the ultimate burden of persuading the [district] court that the [public employer's] evidence did not support an inference of prior discrimination and thus a remedial purpose, or that the plan instituted on the basis of this evidence was not sufficiently "narrowly tailored."

*Id.* at 1856 (O'Connor, J., concurring in part and concurring in the judgment).

■ Assuming that our limited remand allowed the intervenors to challenge the legal effect of the plaintiffs' statistical evidence, we hold that the government had a sufficient basis for concluding that remedial action was necessary. The district court's finding that the plaintiffs had established a *prima facie* case of discrimination, *Howard IV,* 671 F.Supp. at 760–61, was amply supported by the record. First, although blacks comprised 14% of the workforce at Warner Robins in 1973, when the plaintiffs' administrative charges were filed, they held only 3.3% of supervisory positions. Record, Vol. 5, Tab 285 at 9. Second, the average grade of white WG employees in 1973 and 1975 was two and half grades higher than that of black WG employees (9.2 to 6.7 and 9.3 to 6.8). *Howard IV,* 671 F.Supp. at 760. Third, in 1973 approximately 75% of black WG employees were in grades 1–8 compared to less than 33% of white WG employees. *Id.* Fourth, as of November of 1974, black WG employees spent more time in lower grade positions than did white WG employees and the average length of service for blacks in WG source positions was greater than the average length of service for whites in those same positions (e.g., the average length of service for blacks and whites in WG 5 was 8.4 years and 2.7 years respectively). Record, Vol. 5, Tab 285 at 11–12. Fifth, EEO documents and computer data demonstrated statistical disparities in the ranking factors (i.e., experience and training, supervisory appraisals, written examinations, and awards) used in both skills locators systems. *Id.* at 11; Fairness Hearing, Record, Vol. II at 29–31. Sixth, conservative statistical studies for the 1971–1978 period indicated standard deviations of 3.53 to 8.19 in the promotion rates for blacks out of WG source grades. *Howard IV,* 671 F.Supp. at 761.

The intervenors argue that a showing of past discrimination must precede the implementation of the promotional relief and that this showing may be made only through the employer's own admittance of such discrimination or through a judicial finding of past discrimination. The intervenors argue that there was an insufficient predicate for the relief in this case because the consent decree contained a denial of liability and because *Birmingham Reverse Discrimination,* 833 F.2d at 1501 n. 22, forecloses the *prima facie* statistical showing from operating as a judicial finding of discrimination. We find their argument unpersuasive.

■ First, as noted above, *Wygant* demonstrates that an employer's denial of liability in the consent decree does not pre-

clude approval of the decree. The government's denial of liability did not bind the district court which was required to examine the consent decree, ascertain whether it represented a reasonable factual and legal determination based on the record, and ensure that it did not violate federal law. *See United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir.1981) (Rubin, J., concurring); *Cotton v. Hinton*, 559 F.2d 1326, 1330–31 (5th Cir.1977). *Wygant* also makes it clear that a judicial finding is not required before a public employer adopts an affirmative action program or enters into a consent decree that provides race-conscious relief.

Second, the footnote in *Birmingham Reverse Discrimination*, relied on by the intervenors, is inapposite and indeed irrelevant to the issue presented in this case. The footnote merely states that no judicial determination of discrimination had been made in that case, thereby distinguishing the affirmative action consent decree at issue in that case from court orders requiring affirmative action to remedy past discrimination. The footnote did not address the effect of a denial of liability in a consent decree nor did it state that a judicial determination of discrimination was a necessary component of a constitutional consent decree. We therefore hold that the government had a compelling and/or important interest in taking remedial action because it had sufficient evidence to justify a conclusion that there had been prior discrimination against blacks at Warner Robins.

C. Narrowly Tailored

 To satisfy strict scrutiny, the promotional relief in the consent decree must be narrowly tailored. As we previously explained, the promotional relief provides that 240 qualified plaintiffs, who were employed at Warner Robins during the 1971–1979 period and are listed in special promotion registers, are to be promoted into 38 target positions. The promotions from this list alternate with promotions from the general list so that every other promotion to the target positions is filled from the special promotion registers. In determining whether the promotional relief is appropriate, we must look to several factors. These factors include the "necessity for the relief and the efficacy of alternative remedies," the "flexibility and duration of the relief, including the availability of waiver provisions," the "relationship of numerical goals to the relevant labor market," and the "impact of the relief on the rights of [the intervenors]." *Paradise*, 107 S.Ct. at 1067.

1. Necessity for particular relief.

The district court determined that the promotional relief was the only way of providing the "full relief necessary to remove promptly the remaining vestiges of discrimination at Warner Robins," especially in light of the decade-long delay in the case, and noted that it had not been presented with any other less intrusive approach that might provide full relief to the plaintiffs within a reasonable time. *Howard IV*, 671 F.Supp. at 767. To evaluate the district court's determination that the promotional relief was necessary, "we must examine the purposes the [relief] was intended to serve." *Paradise*, 107 S.Ct. at 1067. The consent decree was entered into to ensure the expeditious equal promotion of blacks at Warner Robins and remedy the effects of years of discrimination. The district court found that "discrimination in [the WG] source positions was pervasive throughout the entire period [in question]," and noted that the promotional relief was directed only to the wage grades where discrimination had occurred. *Howard IV*, 671 F.Supp. at 763. *Cf. Paradise*, 107 S.Ct. at 1067–70 (order requiring promotion of equal number of blacks and whites to state trooper positions in Alabama Department of Public Safety was necessary to eliminate the effects of the Department's previous discrimination, to ensure expeditious compliance with previous decrees pertaining to that discrimination, and to eliminate the possible effects of the Department's delay in developing a procedure without adverse impact on blacks).

The intervenors contend that the theory behind the number of promotions which are

reserved for qualified plaintiffs is wrong because the 6.5% attrition rate at Warner Robins indicates that only 122 of the 240 plaintiffs who were discriminated against on the median date of January 1, 1975 remain in the workforce. Brief for Intervenors at 42–43 & n. 18. We dismiss this argument as improperly raised. Our remand limited the issues that the intervenors could raise and specifically denied them standing to challenge the existence of past discrimination or any other issue concerning the merits of the dispute. *Howard III*, 782 F.2d at 960–61.

The intervenors also argue that the promotional relief was unnecessary because other remedial alternatives were available. According to the intervenors, the relief could have been spread out over a longer period of time and double promotions (i.e., promoting off both the regular register and the special promotion register) could have been used. These alternatives, however, are not feasible because they do not place the plaintiffs in their rightful place or do not do so as expeditiously.[9] The district court, which has been involved with the litigation between the government and the plaintiffs since its inception in 1975, did not err in finding that the promotional relief was necessary. The government's efforts to eliminate the effects of past discrimination would have been thwarted unless 240 qualified plaintiffs were promoted to the 38 target positions.

## 2. Flexibility of relief.

The flexibility and short duration of the promotional relief cannot seriously be called into question. First, the relief does not prevent white employees from being promoted to the affected wage grades because promotions to qualified plaintiffs alternate with general promotions so that every other promotion to a targeted position is from the special promotion registers. White employees are at most delayed in receiving a promotion to a limited number of specified positions. Second, to be promoted under the terms of the consent decree, the plaintiffs must meet certain qualification criteria. To be included on the special list the class member had to (1) "first meet the normal, basic eligibility requirements for the position sought; (2) the class member must have higher supervisory ratings in late 1984 than other blacks evaluated by the same supervisor; and (3) the seniority of the employee as determined by his service computation date must be considered." *Howard IV*, 671 F.Supp. at 763 (Record Cites omitted). Third, the government is not required to make a promotion unless one is necessary. Fourth, the relief is not meant to set employment percentage goals or ensure a racially balanced workforce, and it evaporates when the 240 promotions are made. *Howard IV*, 671 F.Supp. at 766–67. Simply put, the promotional relief does not constitute blind hiring by the numbers and does not amount to a rigid and impermissible quota system. *See Paradise*, 107 S.Ct. at 1070–71 (order requiring promotion of equal number of blacks and whites was flexible and temporary because it could be waived if there were no qualified blacks, and no gratuitous promotions had to be made).

## 3. Numerical goals.

The relationship of the numerical goal of the promotional relief to the percentage of blacks in the labor force is not a relevant factor in this case. The 240 special promotions do not represent or achieve any aggregate proportionality. Once the 240 promotions are made, the promotional relief ceases, regardless of the percentage of blacks or whites in higher wage grades.

## 4. Impact of the relief.

We agree with the district court that the impact of the promotional relief on the intervenors is "relatively diffuse." *Ho-*

---

**9.** The intervenors' argument that the promotional relief should have been tempered by red-circling of pay rates or seniority for white employees who would have been promoted but for the 240 promotions, Brief for Intervenors at 44, is unpersuasive. Those employees, like all others at Warner Robins, do not have a legitimate expectation of being promoted, *Howard IV*, 671 F.Supp. at 766 n. 3, and, as we indicated earlier, there is no evidence that any given intervenor would have received a promotion but for the promotional relief.

*ward IV,* 671 F.Supp. at 767. To begin with, the relief does not have the drastic impact of layoff requirements found constitutionally impermissible in *Wygant,* and it does not impose a bar to the intervenors' advancement. *See Paradise,* 107 S.Ct. at 1073; *Local 28,* 106 S.Ct. at 3052–53. While the relief may delay the promotions of certain intervenors (those who are actually promoted) to the target positions, it does so only for a limited time. Moreover, "[a]lthough some white [employees] will have their promotions delayed, it is uncertain whether any individual [employee], white or black, would have achieved a different [grade], or would have achieved it at a different time, but for the promotion requirement." *Paradise,* 107 S.Ct. at 1076 (Powell, J., concurring).

Furthermore, the intervenors and other white employees who are delayed in possible promotions to the target positions are still eligible for other promotions. The 169 promotions that were made from December of 1984 to October of 1986 comprised only 4.3% of the promotions made at Warner Robins during that period of time. *Howard IV,* 671 F.Supp. at 767. *See also Howard II,* 597 F.Supp. at 1503 (special promotions are expected to constitute only 6.5% of all promotions made during period of implementation of the consent decree). The diffused impact of the promotional relief on the intervenors is further highlighted by the fact that 56 of the 137 named intervenors are not eligible or otherwise unable to be promoted to the target positions and that of the remaining 83 intervenors, 43 have been promoted. *Howard IV,* 671 F.Supp. at 767 n. 4.

The intervenors assert that the promotional relief is not diffuse because it applies only to 38 target positions at Warner Robins and therefore burdens a small segment of the workforce. Brief for Intervenors at 43. We disagree. As the government pointed out in the district court, over 8,000 whites are qualified for promotions to the target positions. Government's Memorandum in Opposition to Intervenors' Motion to Vacate Promotional Provisions of Consent Decree, Record, Vol. 7, Tab 323 at 25. *See* Workforce Statistics Exhibit, Index # 275 at E2–3 (indicating the number and percentage of black and nonblack employees qualified for promotions to each of the 38 target positions). The burden imposed by the promotional relief does not fall upon a narrow segment of the workforce. Putting aside the numbers we have just mentioned, the intervenors' argument proves too much. If the promotional relief extended to all positions at Warner Robins, thereby satisfying the intervenors' concerns, it would be criticized on the ground that it was not narrowly tailored because it was not limited to those positions in which the plaintiffs had been denied promotions. Given the difficulties inherent in fashioning a proper remedy in this case, the promotional relief strikes the proper balance.

### 5. Actual victims.

The intervenors argue that the best procedures were not used to determine which black employees were discriminatorily denied promotions. As we noted in Part I.A., due to the nature of Warner Robins' promotion system, there are no records that would permit such identification. It would also have been futile to inquire which of the plaintiffs applied for promotions, since all employees at Warner Robins are initially considered for all vacancies without having to apply for them. The district court's finding that the best method of determining the actual victims of discrimination at Warner Robins was utilized in the consent decree, *Howard IV,* 671 F.Supp. at 763, is not clearly erroneous. *See Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 479 F.Supp. 101, 115–16 (D.Conn.1979) (affirmative action program for nonvictims would be devised if identification process could not identify enough actual victims of discrimination to fill 102 positions which had been set aside), *aff'd in part and vacated in part on other grounds,* 647 F.2d 256 (2d Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). *Cf. Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 261 (5th Cir.1974) (individualized hearings to determine which employees were actual

victims of discrimination entitled to award of back pay are not required when "the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices ... calls forth the quagmire of hypothetical judgment"). Our conclusion that the promotional relief is narrowly tailored is buttressed by the intervenors' failure to show that any of the plaintiffs were not discriminated against.

### III. TITLE VII CLAIM

The Supreme Court has held that Title VII's limits on a public employer's adoption of affirmative action programs or race-conscious relief embodied in consent decrees do not extend as far as those of the Constitution. *See Johnson v. Transportation Agency*, 480 U.S. 616, 627 n. 6, 107 S.Ct. 1442, 1449 n. 6, 94 L.Ed.2d 615 (1987); *Steelworkers of America v. Weber*, 443 U.S. 193, 206 n. 6, 99 S.Ct. 2721, 2729 n. 6, 61 L.Ed.2d 480 (1979). Our determination that the promotional relief does not violate the Fifth Amendment therefore means that it satisfies § 703 of Title VII, 42 U.S.C. § 2000e–2(a), which makes it unlawful for employers to discriminate on the basis of race, color, religion, sex, or national origin but does not completely prohibit all affirmative action programs. *See Weber*, 443 U.S. at 208, 99 S.Ct. at 2729.[10]

### IV. CONCLUSION

We acknowledge that the two legal grounds upon which we base our opinion may be considered dicta. The intervenors' argument that the plaintiffs' showing of past discrimination was insufficient to overcome the intervenors' Fifth Amendment rights was arguably foreclosed by our opinion in *Howard III.* To foreclose that argument, we have answered it.

The remand in *Howard III* as we interpret it gave intervenors the opportunity to prove that implementation of the decree would have an adverse impact on them and if so intervenors could attack the remedial provisions awarded to plaintiffs. Although intervenors failed to show any adverse impact, we nevertheless approve the promotional remedy based on the record in the case and the district court findings.[11]

AFFIRMED.

---

10. Because a consent decree is not an "order" within the enforcement provisions of Title VII, it cannot be challenged on the ground that it violates § 706(g) of Title VII, 42 U.S.C. § 2000e–5(g), which prohibits a court from entering an order requiring an employer to give relief to an employee who suffers adverse job action if the action was taken for any reason other than discrimination on account of race, color, religion, sex, or national origin. *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 521–24, 106 S.Ct. 3063, 3075–77, 92 L.Ed.2d 405 (1986). Even § 706(g), however, permits, in certain cir-

cumstances, remedies which are not limited to actual victims of discrimination. *Local 28*, 106 S.Ct. at 3047–49 (plurality opinion), 3054 (Powell, J., concurring).

11. Given our decision, we need not address whether the intervenors' challenge to the promotional relief was rendered moot to the extent that 169 plaintiffs had already been promoted by the time we rendered our opinion in *Howard III.*