James A. BENNETT, et al., Plaintiffs,

v.

Richard ARRINGTON,
et al., Defendants.

B'HAM ASS'N OF CITY EMPLOYEES,
et al., Plaintiffs,

v.

Richard ARRINGTON,
et al., Defendants.

Robert L. WILKS, et al., Plaintiffs,

v.

Richard ARRINGTON,
et al., Defendants.

In re BIRMINGHAM REVERSE DIS-
CRIMINATION EMPLOYMENT
LITIGATION.

Nos. CV 82–P–0850–S, CV 82–P–
1852–S, CV 83–P–2116–S and
CV 84–P–0903–S.

United States District Court,
N.D. Alabama, S.D.

Aug. 14, 1992.

Barbara Thawley, Washington, D.C., for U.S. Dept. of Justice, Civ. Rights Div.

Jack Selden, U.S. Atty., Caryl Privett, Asst. U.S. Atty., Birmingham, Ala., for U.S. Atty.

Thomas L. Stewart, Laveéda Morgan Battle, Birmingham, Ala., Personnel Bd. of Jefferson County.

James Alexander, Robert Spotswood, Birmingham, Ala., for City of Birmingham and Arrington.

Demetrius Newton, City Atty., Birmingham, Ala., for Birmingham.

Raymond Fitzpatrick, Birmingham, Ala., for plaintiff intervenors in consolidated cases.

Susan Reeves, Birmingham, Ala., Robert D. Joffe, New York City, St. John Barrett, Washington, D.C., for defendant intervenors.

## OPINION

POINTER, Chief Judge.

The City of Birmingham ("the City") and the Jefferson County Personnel Board ("the Board"), after prolonged litigation in the 1970s over discriminatory hiring and promotion of blacks and females, entered into settlement negotiations with a class of black plaintiffs ("the Martin Intervenors") and the United States. The negotiations resulted in separate proposed consent decrees with the City and the Board. A fairness hearing was held in August 1981 to consider objections from all interested parties. The Birmingham Firefighters Association ("BFA"), as amicus curiae, presented arguments opposing the consent decrees. Their opposition focused on the proposed affirmative action goals, which would impact adversely on white males in the Fire Department.

The court approved the consent decrees on August 18, 1981. The following day the BFA and two white firefighters moved to intervene in the suit. Their motion was denied as untimely, a ruling that was later upheld by the Eleventh Circuit in *United States v. Jefferson County*, 720 F.2d 1511, 1520 (11th Cir.1983). A separate suit (CA 82–P–850–S) was then filed by seven white firefighters against the City and the Board, claiming "reverse discrimination" would re-sult from enforcement of the consent decrees. An application for a preliminary injunction was denied, and the Eleventh Circuit affirmed, ruling that the white firefighters were unable to show irreparable harm if the decrees were enforced. *United States v. Jefferson County*, 720 F.2d at 1520, 1519–20 n. 21. Similar cases were later filed by other white employees of the City.

These cases were consolidated as the "Birmingham Reverse Discrimination Employment Litigation." Once the Martin Intervenors intervened as party defendants to defend the decrees, a motion for partial summary judgment was brought by the City and the intervening parties. The motion for partial summary judgment was denied, and a trial was held in December 1985 on the merits of three test cases.[1] Following the trial, the court denied the plaintiffs' claims.[2] An appeal followed, and the Eleventh Circuit held that the white plaintiffs were not bound by the consent decrees since they were not a party to them. *In re: Birmingham Reverse Discrimination Employment Litigation*, 833 F.2d 1492 (11th Cir.1987). The Supreme Court agreed with the Court of Appeals. *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989). The case was remanded to the district court for a further trial on the merits of the plaintiffs' reverse discrimination claims. Following additional discovery, the trial was held October 21, 1991, and post-trial briefs and reply briefs were submitted by the parties. Upon consideration of the evidence before the court, the court concludes that plaintiffs' claims must be denied.

---

1. The three test cases were CV 83–P–2116–S, involving the claims of plaintiffs Robert K. Wilks, Ronnie J. Chambers, Carlice E. Payne, John E. Garvich, Jr., Robert Bruce Millsap, James W. Henson, Howard E. Pope, and Charles E. Carlin; CV 82–P–850–S, involving the claims of plaintiffs Floyd E. Click, James D. Morgan, Joel Alan Day, Gene E. Northington, Vincent Joseph Vella and Lane L. Denard; and CV 82–P–1852–S, involving the claims of plaintiffs Kenneth O. Ware and the Birmingham Association of City Employees. The plaintiffs in the first two cases listed here were employees of the Birmingham Fire Department; Kenneth O.

Ware, an individual plaintiff in the third listed case, was a City Civil Engineer. There have been other members of the fire and engineering departments allowed to intervene in CV 84–P–0903–S.

2. Numerous findings of fact were made by the district court. See 39 F.E.P.C. 1431–46 (BNA) (N.D.Ala.1985). There is no need to repeat these findings, which were not set aside on the appeal and under the law of the case remain as determinations for purposes of this decision.

## STANDARD OF REVIEW

■ Since this case is founded on race-based employment decisions by a public employer, although pursuant to a court-approved remedial action plan, the court must apply a strict standard of review, or strict scrutiny, to the city's decision-making process. *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) (O'Connor, J., separate opinion).

## CIVIL RIGHTS ACT OF 1991

An initial matter to be addressed is the applicability of section 108 of the Civil Rights Act of 1991. Section 108 amends 42 U.S.C. § 2000e–2 to provide that employment decisions made pursuant to a valid consent decree which is entered under claims of public employment discrimination may not be challenged on a constitutional basis (i) by a person who, prior to the entry of decree, had actual notice of the decree sufficient to advise him that it could adversely affect him and that he could challenge it, and an opportunity to object, or (ii) "by a person whose interests were adequately represented by another person who had previously challenged the [decree] on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact." It is unnecessary to step into the mire of possible retroactive application of this section, since neither of the conditions was satisfied. The court's decision therefore is grounded in the constitutional analysis developed in recent Supreme Court rulings.

## ANALYSIS

■ The central issue is whether the constitutional rights of the white firefighters were violated by the promotional decisions made by the City pursuant to the consent decree entered into by the City, the United States, and the Martin Intervenors.[3] The Eleventh Circuit directed this court to

evaluate whether the consent decree, while not binding on the white firefighters, nevertheless provided the basis for a defense by the City to charges of discrimination when making promotional decisions pursuant to this decree. This directive involves basic consideration of a two-pronged inquiry under *Johnson v. Transportation Agency,* 480 U.S. 616, 631, 637–38, 107 S.Ct. 1442, 1451, 1454–55, 94 L.Ed.2d 615 (1987). The first inquiry is whether the adoption of a race-based promotional plan "was justified by the existence of a 'manifest imbalance' that reflected underrepresentation of [blacks] in 'traditionally segregated job categories'." *Id.* at 631, 107 S.Ct. at 1451 (quoting *Steelworkers v. Weber,* 443 U.S. 193, 197, 99 S.Ct. 2721, 2724, 61 L.Ed.2d 480 (1979)). The second consideration is whether the plan "unnecessarily trammeled the rights of [white] employees or created an absolute bar for their advancement." *Id.* at 637–38, 107 S.Ct. at 1454–55. The court concludes that the first condition is met and that the plan did not unnecessarily trammel the rights of whites, nor did it create an absolute bar to their opportunity for advancement.

### Was the City justified in entering the consent decree?

Since the City's promotional decisions were clearly race-conscious in that they were mandated by a race-conscious consent decree, the burden is on the City to show its adherence to the decree provides a valid defense for the plaintiffs' claims. The City has met that burden.

First, the City must show that before entering into the consent decree it had a "strong basis in evidence" for believing that it had discriminated against minorities. It does not have to prove that there was an actual finding, either judicial or otherwise, that it discriminated in order to show that it was justified in entering the consent decree.[4] Although *Croson* did affect the way

---

**3.** The court had decided at the December 1985 trial that these promotional decisions had been made pursuant to the decree. 39 F.E.P.C. 1431 (BNA) (N.D.Ala.1985). These findings were not

disturbed on appeal by the Eleventh Circuit or the Supreme Court.

**4.** The burden on the defendants in this action is not to prove at trial the existence of past dis-

the court evaluates a claim of reverse discrimination, it did not overrule the Supreme Court's earlier holding that statistical evidence can support a finding of discrimination: "Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." *Hazelwood School District v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977), *quoted in Peightal v. Metropolitan Dade County*, 940 F.2d 1394, 1401–02 (11th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992). In the 1985 trial of these cases, the court found that there was significant evidence of prior discrimination at the time the City entered into the consent decrees. *See In re: Birmingham Reverse Discrimination Employment Litigation*, 39 F.E.P.C. (BNA) 1431, 1437, ¶¶ 12–13 (N.D.Ala.1985); *see also United States v. Jefferson County*, 28 F.E.P.C. (BNA) 1834 (N.D.Ala.1981). The additional evidence presented in the 1991 trial confirms those findings.

It should be emphasized that, prior to the City's entering the consent decrees, there had been a district court decision—affirmed in pertinent parts by the Court of Appeals—holding that the tests used by the Personnel Board to determine persons eligible for entry-level positions in the City's police and fire departments had a severe adverse impact on blacks and were not sufficiently job-related to pass muster under Title VII. *See Ensley Branch of N.A.A.C.P. v. Seibels*, 616 F.2d 812 (5th Cir.1980). The discriminatory restrictions on these entry-level positions also meant, of course, that blacks had been denied the opportunity to hold higher level positions in these departments. There then had been— again before the consent decree was entered—a further trial, with voluminous evidence, attacking scores of other tests and selection devices administered by the Personnel Board as having a similar adverse impact and insufficient job-relatedness. It was only when faced with the imminence of a decision by the district court concerning these tests and devices that the consent decrees were entered.

### Was the consent decree narrowly tailored?

The closer question seems to be the second prong of this inquiry: Whether the consent decree was sufficiently limited and tailored to the appropriate relief. An initial consideration in determining whether the relevant decrees were narrowly tailored is whether the City pursued other means to increase the representation of minorities in the Department. Other factors utilized by the Supreme Court in *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 1066, 94 L.Ed.2d 203 (1987) (Brennan, J., plurality opinion) (citing *Sheet Metal Workers v. EEOC*, 478 U.S. 421, 481, 486, 106 S.Ct. 3019, 3052, 3055, 92 L.Ed.2d 344 (1986)), in evaluating whether race-conscious employment measures by a public employer are narrowly tailored, are "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Id.* at 171, 107 S.Ct. at 1066.

These factors, applied to the facts of this litigation, show that the decree is limited and tailored to the relief necessary to overcome the employment effects of past discrimination by the City. The City did attempt to correct its past discrimination in or around 1974, prior to the entry of the consent decree. City Mayor Richard Arrington testified that an affirmative action

---

crimination by the City. Instead, the issue is whether at the time it agreed to the consent decree the City had a strong basis in evidence for believing that there had been discrimination against blacks (and women). *See, e.g., City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 106 S.Ct.

1842, 90 L.Ed.2d 260 (1986) (plurality opinion); *Howard v. McLucas*, 871 F.2d 1000 (11th Cir. 1989). Indeed, actual "findings" of discrimination need not be made by the City at all. *See Wygant*, 476 U.S. at 289, 106 S.Ct. at 1854 (O'Connor, J., concurring in part and concurring in the judgment); *Howard v. McLucas*, 871 F.2d at 1006.

ordinance was proposed and submitted to the City Council which would have "establish[ed] some goals for minority hiring" and "would have permitted the City to carry out certain efforts in recruitment to try to increase the pool in which [the City] hired people.... It was aimed at trying to increase minority hiring in the City of Birmingham." Trial Trans. at 96.[5] The ordinance was adopted by the City Council, but later vetoed by the then Mayor Seibels. A subsequent ordinance was later passed which placed the responsibility on various City department heads to set and achieve minority employment goals. Trial Trans. at 97–98. These alternative measures were not effective, as evidenced by the hiring of only two blacks in the Fire Department by 1974. Indeed, the employment records offered at trial show that as of July 21, 1981, only 9.3% of the firefighters were black, and none of the fire lieutenants, captains, or battalion chiefs were black.[6]

The City decree also satisfies considerations of flexibility and duration. It does not require the City to promote unqualified blacks in the Fire Department. Instead, it requires that, when both black and white firefighters are certified to the Fire Department as qualified applicants for a promotion, the Department will alternate between blacks and whites, selecting the white or black applicant who is ranked highest according to the Board's ranking procedure.[7]

The consent decree is also tailored to the relief sought by its limitation in time to achievement of the long term goal of attaining employment representation of blacks and women in the City's work force in approximate relation to their respective percentages in the civilian labor force of Jefferson County as shown in the 1970 federal census. It provided for modification in the long term goal in accordance with any changes in the appropriate work force reflected in the 1980 census. City of Birmingham Consent Decree, para. 5. Annual goals were established to meet that long term goal. Specifically in regard to promotion in the Fire Department, an interim goal was established, subject to the availability of qualified blacks, of the promotion of one black for the next two captain positions that were vacant. Thereafter, until the long term goal in the Department was met, blacks should be promoted to captain vacancies "at twice the black percentage representation in the job classification from which promotional candidates are traditionally selected for [that] job." Id. at para. 8. The decree further provided for direct recruitment of blacks when insufficient numbers of blacks to fill the interim goals were certified to the City by the Board. Id. at para. 10b(i). The decree also provided that reduction of the underrepresentation of blacks and females would be pursued through departmental affirmative action plans, id. at para. 11; through an affirmative job recruitment program administered through, but not limited to, local high schools, vocational schools, colleges and organizations aimed at obtaining job opportunities for minorities, id. at para. 14;

---

**5.** Mayor Arrington, then a member of the City Council, in 1974 supported the City's adoption of the ordinance.

**6.** According to the Birmingham Personnel Board's July 21, 1981, affirmative action report, 42 of 453 firefighters in the Birmingham Fire Department were black, 2 of the 10 fire communications operators were black, and zero out of 94 fire lieutenants, 31 fire captains and 15 fire battalion chiefs were black.

**7.** The Board ranks individuals according to two factors. The first factor is the applicant's score on a job-related test administered by the Board. The second factor is the number of seniority points achieved by the individual. Seniority points are accumulated according to the num-

ber of years of service, with a maximum of 20 points available to an individual.

The court made specific findings of fact regarding seniority points in the 1985 trial of these consolidated cases. In short, it found that there was "no evidence demonstrating a relationship between [Department] seniority and job performance as an officer." Since blacks were effectively barred from employment in the Department, as evidenced by the presence of only two black hires before the first discrimination suit in 1974, seniority points were found to have an "obvious adverse impact." Thus, seniority was found not to be a factor that the Fire Department could use in choosing between black and white candidates for promotion. 38 F.E.P.C. (BNA) 1431 (N.D.Ala.1985) (Findings of Fact Nos. 58–60).

through advertising for qualified minorities, *id.;* and through job posting, *id.* at para. 15. In addition, the decree provided that any party could move the court for dissolution of the decree after six years from the date it was entered. *Id.* at para. 55. In fact, upon motion, the decree was modified in May 1991 by this court based on its continuing jurisdiction over the decree.[8]

The decree was also tailored to an appropriate relevant labor market when the City agreed to it. The decree provides for hiring goals for blacks in proportion to their representation in the labor force of Jefferson County.[9] Since the position of firefighter is an unskilled position, this is an appropriate correlation under *Johnson v. Transportation Agency*, 480 U.S. 616, 631–32, 107 S.Ct. 1442, 1451–52, 94 L.Ed.2d 615 (1987). The promotions within the Fire Department to captain and battalion chief were tied to the black representation within that Department, albeit accelerated by the original interim goal to twice the representation of blacks in the Department.

In earlier litigation of this case, the court found that "[s]ince the entry of the Decree, some [whites] have been promoted immediately upon certification, others after only a delay, and those not promoted have had or will have an opportunity to compete as each new exam is given and an eligible register (which is valid for only a year) is created." *See* 39 F.E.P.C. (BNA) 1431 (N.D.Ala.1985) (Findings of Fact No. 14). These findings show that the effect on third parties, specifically the white firefighters complaining of racial discrimina-

tion in this case, is an acceptable burden. There were no provisions to use layoffs as a means for favoring junior black employees over more senior white employees, nor was there an absolute bar to promotions for white Department members, since half of the promotions would be whites. *See Johnson v. Transportation Agency*, 480 U.S. 616, 631–32, 107 S.Ct. 1442, 1451–52, 94 L.Ed.2d 615 (1987).

## CONCLUSION

This court concludes that the City's actions, taken pursuant to the consent decree constituted valid, constitutional decisions. *See, e.g., Stuart v. Roache*, 951 F.2d 446 (1st Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992). The various claims, counterclaims, and crossclaims in CV 82–P–850–S, CV 82–P–1852–S, and CV 83–P–2116–S must be denied. In the absence of any just reason for delay, the order accompanying this opinion also directs final judgment in CV 84–P–0903–S pursuant to Fed.R.Civ.Proc. 54(b) to the extent these matters have previously been incorporated as part of that case.

### Order and Final Judgment

In accordance with the accompanying Opinion, it is ORDERED and ADJUDGED as follows:

1. All claims, counterclaims, and crossclaims in CV 82–P–850–S are DISMISSED with prejudice, and each party shall bear its own costs.

2. All claims, counterclaims, and crossclaims in CV 82–P–1852–S are DISMISSED

---

**8.** The May 1991 modifications were amended by order of the district court dated September 25, 1991, to provide, in relevant part, that the promotional goals set for blacks in paragraph 8 of the decree "shall not apply if all testing and screening procedures utilized by the Personnel Board and by the City with respect to a job classification either have no adverse impact upon such persons or are demonstrated to be valid under applicable law." September 25, 1991, order amending the consent decree with the City of Birmingham. Furthermore, the decree modification was amended to provide that the interim goals for promotions in the Fire Department would change to reflect promotions "in approximately the same proportion as the percentage of black applicants for such posi-

tions" once the hiring goals for blacks in the Department were met. *Id.*

**9.** Expert witness testimony regarding the City's selection of the relevant labor force shows that the City did not select the labor force which would have reflected the highest percentage of blacks. The labor force of the City of Birmingham proper, according to the 1980 federal census, consisted of 49.9% blacks and 50.1% whites, while the labor force of Jefferson County was 28.1% blacks and 71.9% whites. Use of the City's relevant labor force in fashioning the City's goals would have resulted in significantly higher goals for black employment.

with prejudice, and each party shall bear its own costs.

3. All claims, counterclaims, and cross-claims in CV 83–P–2116–S are DISMISSED with prejudice, and each party shall bear its own costs.

4. All claims for attorneys fees in CV 82–P–850–S, CV 82–P–1852–S, and CV 83–P–2116–S under 42 U.S.C. § 1988, Title VII of the Civil Rights Act of 1964 and 28 U.S.C. § 2412(d) are DENIED.

Pursuant to Fed.R.Civ.P. 54(b), the Court determines that there is no just reason for delay, and expressly directs that judgment in CV 84–P–903–S be entered to the extent the claims, counterclaims, and crossclaims described in paragraphs 1–4 of this order have otherwise been incorporated as part of CV 84–P–903–S.